**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CLINTON EVANS et al.**                                        **CIVIL ACTION**

**VERSUS**                                                                  **NO. 18-8972**

**JOSEPH LOPINTO et al.**                                     **SECTION: "G"(1)**

## ORDER AND REASONS

In this litigation, Plaintiffs Clinton Evans and Jeresa Morgan (collectively, "Plaintiffs")
bring claims individually and on behalf of their deceased son, Jatory Evans ("Evans"), against
Defendants CorrectHealth Jefferson ("CHJ"), Jefferson Parish, Sheriff Joseph Lopinto
("Lopinto"), Corrections Administrator and Deputy Chief Sue Ellen Monfra ("Monfra"), Deputy
Christopher Mayeaux ("Mayeaux"), Dr. William Lo ("Dr. Lo"), David Jennings ("Jennings"), and
Ironshore Specialty Insurance Co. ("Ironshore"), (collectively, "Defendants").[1] Plaintiffs allege
that Defendants failed to properly monitor Evans while he was incarcerated in Jefferson Parish
Correctional Facility ("JPCC") and that their acts or omissions lead to Evans' death by suicide.[2]
Pending before the Court is Defendants CHJ, Ironshore, Jennings and Dr. Lo's (collectively "CHJ
Defendants") "Motion for Summary Judgment On Plaintiffs' 1983 Claims and Request for
Punitive Damages."[3]

---

[1] Rec. Doc. 6 at 2–5.

[2] *Id.* at 1.

[3] Rec. Doc. 67.

1

CHJ Defendants argue that they are entitled to summary judgment because (1) all of Plaintiff's § 1983 claims fail because the Medical Review Panel found that CHJ Defendants' treatment was not below the standard of care; (2) CHJ cannot be held vicariously liable for Jennings' and Dr. Lo's conduct; and (3) Plaintiffs cannot establish punitive damages against any of the CHJ Defendants. For the reasons described in detail below, CHJ Defendants are not entitled to summary judgment on all claims. Specifically, the Court finds that the Medical Review Panel's opinion does not preclude Plaintiffs from establishing a deliberate indifference claim. The Court further finds that although Plaintiffs cannot establish a deliberate indifference claim against Dr. Lo, a reasonable jury could find that Jennings acted with deliberate indifference. As a result, the jury may also award punitive damages against Jennings. Because the Fifth Circuit is currently considering whether a private corporation performing government functions can be held vicariously liable under § 1983 and whether such a corporation can face punitive damages, the Court defers ruling on those issues pending the Fifth Circuit's decision on those issues. Thus, considering the motion, the memoranda in support and in opposition, and the applicable law, the grants the motion in part, denies it in part, and defers ruling in part.

## I. Background

### A.  *Factual Background*

The Amended Complaint alleges that Evans was a pre-trial detainee in the custody and care of the Jefferson Parish Sheriff's Office at JPCC when he died by hanging in his cell on September 27, 2017.[4] Plaintiffs allege that Evans had an extensive history of PTSD for which he had

---

[4] Rec. Doc. 38.

previously been treated with medication.[5] Plaintiffs aver that Evans reported numerous incidents of mental distress while at JPCC.[6] For example, Plaintiffs aver that Evans was seen by Social Worker David Jennings after reporting that he felt like he was going crazy, could not sleep, and described other PTSD symptoms, and Jennings referred him to a psychiatrist to be evaluated for psychosis.[7] In December 2016, Plaintiffs allege Evans reported that he was having headaches and experiencing feelings of "jitteriness and shaking."[8] In February 2017, Plaintiffs aver that Evans was seen by Jennings after reporting that he was having flashbacks of his deployment to Afghanistan.[9] Plaintiffs aver that Jennings "simply noted that [Evans] was in no acute distress."[10] The following day, Plaintiffs allege that Evans reported again that he was "having visions from [his] Afghanistan events (deployment) and other events," and that he had "painful knots in his arms and legs."[11] Plaintiffs aver that he also reported not being able to sleep.[12] Plaintiffs allege that Evans was not seen by Jennings or Dr. Lo in response to these reports. [13]

Plaintiffs alleged that on March 25, 2017, Evans was placed on suicide watch after wrapping a towel around his neck.[14] Plaintiffs aver that the reason for his placement on suicide

---

[5] *Id.* at 5.

[6] *Id.* at 6.

[7] *Id.*

[8] *Id.* at 6

[9] *Id.*

[10] *Id.*

[11] *Id.* at 7.

[12] *Id.*

[13] *Id.*

[14] *Id.*

watch was listed as "severe depression."[15] Plaintiffs contend that Evans was never seen by Dr. Lo or any other psychiatrist while on suicide watch.[16] Rather, Plaintiffs aver that two days after being put on suicide watch, Evans was seen by Jennings, who then discharged Evans.[17] Plaintiffs allege that his discharge did not include any kind of "step-down process," and that Evans did not receive a follow up visit which he was supposed to have a week after discharge.[18]

Plaintiffs aver that on May 10, 2017, Evans reported "multiple nightmares, anxiety issues, depression with [his] thoughts, [and] thinking about [his] own death."[19] Nevertheless, Plaintiffs allege that Evans was not seen until May 17 by Jennings.[20] Plaintiffs aver that during this visit, Evans noted that his mother and sister were "the reasons that he did not act on his thoughts of suicide."[21] Nevertheless, Plaintiffs aver that Jennings reported that Evans was in no acute distress.[22]

Plaintiffs allege that on May 28, 2017, Evans requested a mental health referral.[23] Plaintiffs aver that Evans saw Dr. Lo, and reported that he was having nightmares and flashbacks.[24] Plaintiffs aver that Dr. Lo noted an "an impression of a mood disorder… and an anxiety disorder," and

---

[15] *Id.*

[16] *Id.* at 8.

[17] *Id.*

[18] *Id.* at 8–9.

[19] *Id.*

[20] *Id.* at 9.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

4

prescribed Risperidone.[25] Nevertheless, Plaintiffs allege that Evans "continued to experience significant periods of despondence and expressed to others that a desire to commit suicide was always in the back of his mind."[26] Additionally, Plaintiffs aver that Evans was placed on suicide watch for a second time on September 1, after a member of the defense team reached out to a JPSO deputy expressing concerns that Evans might harm himself.[27] Plaintiffs allege that Evans was seen by Jennings on September 1, and that Jennings "scored his suicide risk as low with a note to follow up with the mental health provider."[28] Plaintiffs allege that he was kept on suicide watch for nearly a week and, although he was seen by nurses, he did not see Jennings or Dr. Lo, nor did he receive counseling or other therapy.[29]

Plaintiffs aver that Jennings discharged Evans on September 6, 2017, stating that Evans told him he was "good," had no intention of harming himself, and had hope for his future.[30] Plaintiffs aver that throughout the rest of September, Evans was in "acute and increasing psychological distress" which Plaintiffs allege other JPCC detainees began to notice.[31] Plaintiffs

---

[25] *Id.* at 9–10.

[26] *Id.* at 10.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 11.

[31] *Id.*

aver that Evans saw Dr. Lo again on September 14, 2017, during which Dr. Lo increased Evans' medication.[32]

Plaintiffs aver that on the night before he died, Evans expressed his intent to kill himself to other detainees.[33] Furthermore, Plaintiffs allege that he was "very quiet and withdrawn" on the day he died and that other detainees were concerned about his change in behavior.[34] Plaintiffs aver that shortly after roll call on September 27, 2017, Evans blocked the view into his cell with a blanket, in violation of JPSO policy.[35] Nevertheless, Plaintiffs allege that Mayeaux, the guard on duty, did nothing to remove the blanket.[36] Plaintiffs aver that other detainees began to become concerned about Evans, and tried to alert Mayeaux, who was unresponsive.[37] When detainee Furnell Daniel was permitted to leave his cell, approximately an hour after roll call, he learned of the concerns for Evans safety and went to check on him.[38] Plaintiffs aver that he looked behind the blanket and saw Evans with the sheet around his neck and his head slumped to one side.[39] Plaintiffs allege that he immediately began shouting and motioning to Mayeaux.[40] Thus, Plaintiffs aver that Mayeux

---

[32] *Id* at 12.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* at 13.

[38] *Id.*

[39] *Id.*

[40] *Id.*

was alerted about Evans' condition no later than between 4:18 and 4:20 PM. Plaintiffs allege that Mayeux delayed for "at least five to six minutes" before calling for assistance.[41]

**B.    *Procedural Background***

On September 26, 2018, Plaintiffs filed a Complaint in this case.[42] On December 7, 2018, Plaintiffs filed the First Amended Complaint, which was identical to the original Complaint.[43] On January 24, 2019, Defendant Jefferson Parish filed a Motion to Dismiss and a request for oral argument on the motion.[44] The Court heard oral argument on the Motion to Dismiss on February 27, 2019,[45] and then denied the Motion to Dismiss without prejudice and gave Plaintiffs 30 days to amend the complaint.[46] On March 27, 2019, Plaintiffs filed a Second Amended Complaint, changing Plaintiffs' allegations against Jefferson Parish, but maintaining the same allegations against other defendants.[47] Thus, the claims involved in this case are outlined below:

- Count One: Section 1983 claim "Based on Establishment of a System in which Prisoners are Denied Appropriate Protection from Harm" against Defendants Lopinto and JP.[48]

- Count 2: Section 1983 claim "Based on Failure to Supervise other Defendants to Ensure Patients Received Appropriate Care and Supervision to Protect Patients from Harm" against Defendants Lopinto, Monfra, and CHJ. [49]

---

[41] *Id*.

[42] Rec. Doc. 1.

[43] Rec. Doc. 6.

[44] Rec. Docs. 16, 17.

[45] Rec. Doc. 22.

[46] Rec. Doc. 25.

[47] Rec. Doc. 38.

[48] Rec. Doc. 38 at 26–27.

[49] *Id*. at 28–29.

7

- Count 3: Section 1983 claim " Based on Deliberate Indifference to Mr. Evans' Constitutional Right to Protection from Harm" against Defendants Lopinto, Monfra, Mayeaux, Lo, Jennings, CHJ, and JP.[50]

- Count 4: Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act "by discriminating against and failing to accommodate a disability" against Lopinto and JP.[51]

- Count 6: [52] Monell claim under § 1983 "based on establishment of policies, patterns, or practices pursuant to which inmates with serious mental health conditions are denied access to appropriate medical care and prevention from harm" against Defendants Lopinto, Monfra, and CHJ.[53]

- Count 7: Medical Malpractice claim against Defendants CHJ, Lo, and Jennings[54]

- Count 8: Negligence and/or Intentional Tort claim against all Defendants[55]

On March 6, 2019, CHJ Defendants filed a Motion to Dismiss.[56] The Court denied the motion without prejudice and stayed the case pending the completion of a medical review panel.[57] On July 27, 2021, the stay was lifted.[58]

---

[50] *Id.* at 29–30.

[51] *Id.* at 30–32.

[52] Plaintiffs' Second Amended Complaint mistakenly skips count 5.

[53] Rec. Doc. 38. at 32–33.

[54] *Id.* at 33.

[55] *Id.* at 34

[56] Rec. Doc. 27.

[57] Rec. Doc. 54.

[58] Rec. Doc. 57.

On March 8, 2022, CHJ Defendants filed the instant Motion for Summary Judgment.[59] On April 26, 2022, Plaintiffs opposed the motion.[60] On May 9, 2022, with leave of Court, CHJ Defendants filed a reply.[61]

## II. Parties' Arguments

### A.    *CHJ Defendants' Arguments in Support of the Motion for Summary Judgment*

CHJ Defendants argue that they are entitled to summary judgment on Plaintiff's claims for supervisory liability in Count 2, deliberate indifference in Count 3, municipal liability in Count 6, and Plaintiff's request for punitive damages.

First, CHJ Defendants argue that all of Plaintiffs' claims under § 1983 fail because mere negligence is not actionable under § 1983.[62] CHJ Defendants contend that because the Medical Review Panel unanimously found that CHJ Defendants were not negligent, Plaintiffs cannot possibly prove their § 1983 claims, "which requires that the defendant act with something more than mere negligence."[63] CHJ Defendants argue that at best, Plaintiffs will be able to show only that there is a "disagreement over the treatment afforded to decedent," but that this is insufficient to support a § 1983 claim.[64] Therefore, CHJ Defendants contend they are entitled to summary judgment on Counts 2, 3 and 6 of the Second Amended Complaint.[65]

---

[59] Rec. Doc. 67.

[60] Rec. Docs. 100, 126.

[61] Rec. Docs. 124, 148.

[62] Rec. Doc. 67-2 at 10.

[63] *Id.* at 11.

[64] *Id.*

[65] *Id.*

Second, CHJ Defendants argue that CHJ is entitled to summary judgment on Plaintiffs' deliberate indifference claim because "there is no vicarious/respondeat superior liability under 1983."[66] CHJ Defendants contend that the Supreme Court has made clear that municipal entities such as CHJ cannot be held liable based solely on the torts of its employees.[67] Therefore, CHJ Defendants argue that Plaintiffs' claims in Count 3 that CHJ is vicariously liable must be dismissed.[68]

Third, CHJ Defendants contend that Plaintiffs cannot recover punitive damages from any defendants.[69] CHJ Defendants contend that punitive damages cannot be imposed against municipalities.[70] Furthermore, CHJ Defendants argue that several district courts in this circuit have held that punitive damages similarly cannot be imposed on "private entities performing government functions," such as CHJ.[71] As to Jennings and Dr. Lo, CHJ Defendants argue that there is no evidence to support a punitive damages award.[72] CHJ Defendants argue that punitive damages are available only where the defendant's conduct is "motivated by evil motive or intent," or "involves reckless or callous indifference to the federally protected rights of others."[73] CHJ

---

[66] *Id.*

[67] *Id.* at 12.

[68] *Id.*

[69] *Id.* at 12–13.

[70] *Id.*

[71] *Id.* at 13.

[72] *Id.* at 14.

[73] *Id.*

Defendants argue that there is no such evidence in this case.[74] CHJ Defendants argue that because the "medical records and unanimous Medical Review Panel Opinion demonstrate [that] [CHJ Defendants] appropriately treated [Evans] on a frequent and ongoing basis, exceeding the standard of care applicable in Louisiana, and complying with the national guidelines of NCCHC," there is no evidence that would support an award of punitive damages.[75]

**B.    *Plaintiffs' Arguments in Opposition to the Motion for Summary Judgment***

In opposition, Plaintiffs argue that CHJ Defendants are not entitled to summary judgment on their claims under Counts 2, 3, or 6, or on their request for punitive damages. First, Plaintiffs argue that the Medical Review Panel Opinion on which CHJ Defendants rely is not dispositive.[76] Rather, Plaintiffs argue that the review panel opinion is "of the same weight as any expert opinion, and therefore can be challenged and rebutted by opposing expert testimony."[77] Plaintiffs argue that there is other evidence, such as medical records, testimony of CHJ witnesses, and expert reports that raise issues of fact as to whether CHJ Defendants were deliberately indifferent to Evans' medical needs.[78]

Plaintiffs argue that Jennings was aware of Evans' risk of suicide and failed to take reasonable measures to abate it.[79] Plaintiffs highlight evidence of Jennings knowledge that Evans

---

[74] *Id.*

[75] *Id.*

[76] Rec. Doc. 126 at 8.

[77] *Id.* at 7–8. Plaintiffs also argue that the medical review panel opinion was improperly rendered because the oaths were improperly administered. *Id.* at 28–29.

[78] *Id.* at 8.

[79] *Id.*

was suicidal, including that Evans was a veteran with a history of PTSD, that he was facing serious criminal charges, and that he had attempted suicide at JPCC in March of 2017.[80] Plaintiffs also point to evidence of Jennings' conduct to suggest that he was indifferent to Evans' risk of suicide. Plaintiffs argue that Jennings discharged Evans from his first suicide watch without following up and that Jennings' interactions with Evans were not confidential.[81] Plaintiffs further contend that after placing Evans on suicide watch for a second time, Evans did not receive any treatment while on suicide watch and was ultimately discharged by Jennings.[82] Plaintiffs argue that this was done in violation of CHJ policy requiring daily visits.[83] Plaintiffs also contend that upon discharge, Jennings did not place Evans on any kind of "step down" program.[84]

Plaintiffs similarly argue that Dr. Lo was aware of Evans' risk of suicide and failed to take reasonable measures to abate it.[85] Plaintiffs highlight evidence suggesting Dr. Lo's awareness of Evans' risk of suicide, including that Dr. Lo knew Evans was facing serious charges, he had been asked to determine if Evans suffered from psychosis, he knew Evans was a veteran with a history of PTSD, he knew Evans had attempted suicide, he knew Evans requested to see a psychiatrist for suicidal ideations, he knew Evans was taking medication, he knew Evans was expressing suicidal thoughts, and he knew that Evans requested stronger medication.[86] Plaintiffs argue that despite

---

[80] *Id.* at 9.

[81] *Id.* at 12.

[82] *Id.* at 14.

[83] *Id.*

[84] *Id.* at 15.

[85] *Id.* at 19.

[86] *Id.* at 20.

this knowledge, Dr. Lo failed to provide appropriate treatment.[87] Plaintiffs contend that Dr. Lo did not see Evans in a confidential setting, but rather in a hallway where anybody could hear their conversations.[88] Furthermore, Plaintiffs argue that Dr. Lo did not see Evans as frequently as he should have, and that Dr. Lo failed to properly monitor Evans' medication.[89] In addition, Plaintiffs argue that Dr. Lo's prescribing Risperdal was done "without documenting any clinical basis for doing so."[90] Plaintiffs point to their expert's report indicating that Risperdal, when prescribed improperly, can cause worsening depression, and that it is not approved for treatment of PTSD.[91] Lastly, Plaintiffs highlight evidence that although Dr. Lo's notes from Evans' September 14, 2017 visit reflected that Evans was suffering from hallucinations, paranoia and psychosis, Dr. Lo "simply persisted with his clinically inappropriate medication, untimely follow-up, and non-private cursory evaluation."[92]

As to CHJ, Plaintiffs argue that CHJ Defendants are not entitled to summary judgment because the only basis offered in its motion was the findings of the medical review panel.[93] Plaintiffs contend that its claims in Counts 2 and 6 as to CHJ are that CHJ failed to supervise or train its employees and has a pattern of failing to treat patients with mental illnesses.[94] Plaintiffs

---

[87] *Id.*

[88] *Id.* at 20–21.

[89] *Id.*

[90] *Id.* at 22.

[91] *Id.*

[92] *Id.* at 24–25.

[93] *Id.* at 25.

[94] *Id.*

contend that the findings of the medical review panel do not provide evidence regarding these claims.[95] Plaintiffs argue that the Medical Review Panel made only two findings with respect to CHJ: (1) that neither CHJ or its employees deviated from the standard of care; and (2) that CHJ was accredited by the NCCHC during Evans' detainment.[96] However, Plaintiffs argue that they have provided evidence that is sufficient to create a dispute of fact as to whether CHJ deviated from the standard of care, and that CHJ's accreditation alone is not dispositive of CHJ's conduct.[97] In addition, Plaintiffs argue that the latter finding is inaccurate, as the NCCHC found that CHJ was not incompliance with three of its standards.[98]

Next, Plaintiffs argue that *respondeat superior* claims and punitive damages are permitted against private companies like CHJ.[99] Plaintiffs argue that *Monell* rule that municipalities are not liable based on *respondeat superior* does not extend to private companies.[100] Similarly, although Plaintiffs acknowledge that punitive damages cannot be imposed against municipalities, Plaintiffs argue that the same rule does not apply to private corporations such as CHJ.[101]

## C.   *CHJ Defendants' Arguments in Further Support of the Motion*

In reply, CHJ Defendants first argue that they are entitled to summary judgment because disagreement with how CHJ Defendants treated Evans is insufficient to establish the constitutional

---

[95] *Id.* at 26.

[96] *Id.*

[97] *Id.*

[98] *Id.* at 27.

[99] *Id.* at 30.

[100] *Id.*

[101] *Id.* at 33.

14

violation necessary under § 1983.[102] CHJ Defendants contend that Plaintiffs must show that CHJ Defendants "refused to treat [Evans], ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct."[103] CHJ Defendants argue that the testimony of Plaintiff's own expert, Dr. Elliot, demonstrates that Plaintiffs cannot meet this standard.[104] CHJ Defendants rely on the following statements from Dr. Elliot: (1) that he thought Jennings and Dr. Lo were "to the best of [their] ability . . . doing what [they] thought was the right thing"; (2) that medical staff responded to Evans' reports; (3) that Dr. Elliot's opinions are based on his disagreement with the medical care provided; and (4) that Dr. Elliot agreed with the decision to take him off of suicide watch based on the information Jennings had.[105]

CHJ Defendants next argue that CHJ's alleged failure to comply with three NCCHC standards does not establish liability under § 1983.[106] CHJ Defendants contend that such standards are not constitutional minimums, and therefore the failure to follow one "does not rise to the level of deliberate indifference."[107]

CHJ Defendants also argue that CHJ's alleged violation of its own policies does not establish a constitutional violation.[108] CJH Defendants contend that the failure to follow a CHJ

---

[102] Rec. Doc 148.

[103] *Id.* at 2.

[104] *Id.* at 15.

[105] *Id.* at 6.

[106] *Id.*

[107] *Id.* at 6–7.

[108] *Id.* at 7.

policy shows "at most, negligence and cannot support a finding of deliberate indifference."[109] In any event, CHJ Defendants argue that although Plaintiffs contend that Jennings failed to follow up with Evans after he returned from court in violation of CHJ policy, the evidence demonstrates that Evans did not actually go to court on the day in question.[110]

CHJ Defendants further contend that Jennings and Dr. Lo's failure to evaluate Evans in a confidential setting does not rise to the level of deliberate indifference. [111] In order to establish a constitutional violation in this context, CHJ Defendants argue that Plaintiffs must show that Evans' medical records were intentionally disclosed or that CHJ Defendants intentionally "fostered an atmosphere of intentional disclosure with deliberate indifference to constitutional rights."[112] CHJ Defendants contend that there is no evidence that Evans medical records were intentionally disclosed or that there was an atmosphere of intentional disclosure.[113]

Defendants further reiterate their argument that CHJ cannot be held liable based on *respondeat superior*. CHJ Defendants contend that Supreme Court and Fifth Circuit precedent make clear that "a private prison management company and/or medical provider sued under 1983 should be treated as a municipality/state actor."[114]

---

[109] *Id*. at 8 (quoting *Smith v. New Orleans City*, 2020 WL 6582284 at *7 (E.D. La. Nov. 10, 2020)).

[110] *Id.* at 8–9.

[111] *Id.* at 10.

[112] *Id.*

[113] *Id.*

[114] *Id.* at 11–12.

Lastly, CHJ Defendants reurge that Plaintiffs are not entitled to punitive damages.[115] CHJ Defendants contend that the medical records, the Medical Review Panel Opinion, and testimony from both parties' experts establishes that Jennings and Dr. Lo treated Evans and did not ignore him.[116] CHJ Defendants further argue that there is no evidence that they were "motivated by evil intent."[117]

### III. Legal Standards

#### A.   *Legal Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[118] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[119] All reasonable inferences are drawn in favor of the nonmoving party.[120] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[121] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a

---

[115] *Id.* at 15–16.

[116] *Id.*

[117] *Id.* at 16.

[118] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[119] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[120] *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

[121] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

matter of law.[122] The nonmoving party may not rest upon the pleadings.[123] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[124]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[125] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[126] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[127] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[128]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory

---

[122] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[123] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[124] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[125] *Celotex*, 477 U.S. at 323.

[126] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[127] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[128] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[129] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[130]

## IV. Analysis

In the instant motion, CHJ Defendants move for summary judgment on Counts 2, 3, and 6 of Plaintiffs' Second Amended Complaint as well as Plaintiffs' request for punitive damages. Under Count 2, Plaintiffs assert a claim under § 1983 for the "failure to supervise other defendants to ensure patients received appropriate care and supervision to protect patients from harm."[131] In Count 3, Plaintiffs assert a claim under section § 1983 for deliberate indifference to Evans' constitutional rights.[132] In Count 6, Plaintiffs assert a *Monell* claim under § 1983 "based on establishment of policies, patterns or practices pursuant to which inmates with serious mental health conditions are denied access to appropriate medical care and prevention from harm."[133] Plaintiffs also request punitive damages.[134]

Title 42 U.S.C. Section 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. "Section 1983 provides a cause of action against any person who

---

[129] *Little*, 37 F.3d at 1075 (internal citations omitted).

[130] *Morris*, 144 F.3d at 380.

[131] Rec. Doc. 38 at 28.

[132] *Id.* at 29.

[133] *Id.* at 32.

[134] *Id.* at 35.

deprives an individual of federally guaranteed rights 'under color' of state law."[135] "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[136] Thus, to establish a claim under § 1983, a plaintiff must establish (1) a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation as committed by a person acting under color of state law.[137]

The Fifth Circuit has recognized that "[t]he constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment."[138] The Court has further explained that "[t]hese rights include the right to medical care and the right to protection from known suicidal tendencies."[139] Specifically, detainees have a right "not to have their serious medical needs met with deliberate indifference."[140] To succeed on a claim for deliberate indifference, a plaintiff must show that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and (2) the official actually drew that inference.[141] However, "[a]n official is not liable unless he 'knows of

---

[135] *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).

[136] *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

[137] *Randolph v. Cervantes*, 130 F.3d 727 (5th Cir. 1997).

[138] *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996))

[139] *Id*. (internal citations omitted).

[140] *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021).

[141] *Id.* (quoting *Dryer v. Houston*, 964 F.3d 372, 389 (5th Cir. 2020).

and disregards an excessive risk' to a plaintiff's safety."[142] Deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."[143] Instead, a plaintiff "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[144] For these reasons, deliberate indifference is "an extremely high standard to meet."[145]

In a § 1983 claim for failure to train or supervise, a plaintiff must show that (1) the supervisor either failed to train or supervise the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.[146]

To assert a 1983 clean against a municipality rather than an individual, a plaintiff must establish both (i) "that a constitutional violation occurred" and (ii) "that a municipal policy was the moving force behind the violation."[147] Under the latter, a plaintiff must show three things: (1) an "official policy or custom 'was a cause in fact of the deprivation of rights inflicted,'[148] (2) the

---

[142] *Id*. (citing *Garza v.*, 922 F.3d at 635).

[143] *Id.* (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

[144] *Id.* (quoting *Domino v. Tex. Dept' of Crim. Just.*, 239 F.3d 447, 756 (5th Cir. 2001)).

[145] *Id.*(quoting *Domino*, 239 F.3d at 756)).

[146] *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v Brenoettsy*, 158 F.3d 908, 911–91 (5th Cir. 1998)).

[147] *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 791 (5th Cir. 2020), *cert. denied,* 141 S. Ct. 901, 208 L. Ed. 2d 455 (2020).

[148] *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

policy "served as a moving force" behind the constitutional violation, [149] and (3) the policy was decided on by a policymaker with "either actual or constructive knowledge of the alleged policy."[150]

Here, CHJ Defendants argue that they are entitled to summary judgment for three reasons: (1) CHJ Defendants argue that all of Plaintiff's § 1983 claims fail because negligence is not actional able under § 1983; (2) CHJ Defendants argue that Plaintiff's claims in Count 3 for deliberate indifference against CHJ should be dismissed because § 1983 does not permit claims for vicarious liability; and (3) CHJ Defendants argue that Plaintiffs cannot recover punitive damages. The Court will address each argument in turn.

### A.   CHJ Defendants' Argument that All of Plaintiffs § 1983 Claims Fail Based on the Medical Review Panel's Determination

CHJ Defendants argue that they are entitled to judgment on all of Plaintiffs' § 1983 claims because the Medical Review Panel determined that CHJ Defendants did not fail to meet the applicable standard of care.[151] Plaintiffs raised state law claims for medical malpractice in Count 8.[152]  On July 8, 2019, the Court stayed this action pending an opinion by a medical review panel formed pursuant to the Louisiana Medical Malpractice Act.[153] Louisiana law states that "[n]o action against a health care provider . . . may be commenced in any court before the claimant's

---

[149] *Id.* (internal citations and quotation marks omitted).

[150] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[151] Rec. Doc. 67-2 at 10–11.

[152] Rec. Doc. 38 at 2, 33.

[153] Rec. Doc. 54.

proposed complaint has been presented to a medical review panel."[154] The Medical Review Panel in this case rendered its opinion on May 4, 2021, finding that the evidence "does not support the conclusion that [CHJ Defendants] failed to meet the applicable standard of care."[155] According to CHJ Defendants, this determination means that Plaintiffs will not be able to prove that CHJ Defendants acted "with something more than mere negligence," which is required to establish deliberate indifference.[156]

Nevertheless, the Medical Review Panel's determination is not conclusive proof foreclosing Plaintiffs' claims. Under Louisiana law, the panel's opinion is not even dispositive as to whether there was medical malpractice. The Louisiana Supreme Court has explained that although the panel's opinion is "admissible as evidence in any action subsequently brought" in court, the opinion "shall not be conclusive."[157] Rather, "as with any expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing viewpoint," and "the jury as trier of fact, is free to accept or reject any portion or all of the opinion."[158] In addition, Louisiana law permits a party to challenge the board's opinion if its decision was based on its resolution of disputed material facts.[159] Although the panel's opinion may be strong evidence against Plaintiffs' claims to the jury, at the summary judgment stage the Court must "refrain[] from

---

[154] La. Rev. Stat. § 40:1231.8(B)(1)(a)(i) (formerly La. Rev. Stat. § 40:1299.47(B)(1)(a)(i)).

[155] Rec. Doc. 67-4.

[156] *Id.*

[157] *McGlothlin v. Christus St. Patrick Hosp.*, No. 10-2775 (La. 7/1/11); 65 So. 3d 1218, 1227.

[158] *Id.* at 1227.

[159] *Id.* at 1229–30.

23

making credibility determinations or weighing the evidence."[160] Therefore, the panel's opinion does not necessarily preclude Plaintiffs from demonstrating "something more than mere negligence." As a result, Defendant is not entitled to summary judgment on this basis.

Plaintiffs provide various pieces of evidence in support of their argument that CHJ Defendants acted with deliberate indifference. "[E]ach defendant's subjective deliberate indifference, [or lack thereof], must be examined separately."[161] Thus, the Court turns to that inquiry now.

### 1.    Alleged Deliberate Indifference of Jennings

Plaintiffs contend that Jennings was deliberately indifferent to Plaintiffs medical needs. In support, Plaintiffs point to various pieces of evidence in the record suggesting that throughout Evans' detention, Jennings failed to ensure that Evans saw Dr. Lo, failed to follow up with Evans on numerous occasions,[162] that Jennings interactions with Evans were short and did not take place in a confidential setting,[163] and that Jennings took only cursory notes during their meetings.[164] Plaintiffs also provide evidence that Jennings' assessed Evans on September 1, 2017, and documented the following:

> IM state he is having SI. Has no plans, but does not know what the future holds. Does not know about his future. Said he hears voices of his ex-girlfriend and is dead now. SI associated with his legal problems. PTSD is attributed to being to was [sic] in Iraq and Afganastan [sic]. No past suicide attempts. Denied command hallucinations. Feeling depressed – poor sleep. Wakes up at night, energy level

---

[160] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[161] *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *see also Tamez v. Manthley*, 589 F.3d 764, 770 (5th Cir. 2009).

[162] Rec. Doc 126-7 at 20–30.

[163] Rec. Doc. 126-2.

[164] *Id.*

'alright', decreased appetite, rumination, hopeless. IM said his depression a 10 on 10 scale.[165]

Additionally, despite Jennings' notation that Evans had "[n]o past suicide attempts," the evidence in the record shows that Evans had made a previous suicide attempt on March 24, 2017.[166] Plaintiffs provide evidence of a JPSO deputy's statement that he observed "Evans with a piece of fabric around his neck and on his cell gate. Inmate Evans was leaning away from the gate causing the fabric to be (appeared) tightened in an attempt to restrict air flow."[167] The evidence further suggests that Jennings' was aware of this attempt, as Jennings was the one who subsequently discharged him after he was placed on suicidal watch following this incident.[168]

Plaintiffs provide evidence that Evans was put on suicide watch for a second time from September 1, 2017 to September 6, 2017.[169] Furthermore, Plaintiffs point to medical records indicating that Evans did not receive any mental health treatment or evaluation during those five days.[170] Plaintiffs point to Jennings' deposition testimony confirming that he and Dr. Lo were the only mental health providers, and that Evans "wouldn't have been seen by a mental health professional person during that period" because "[i]t was a long weekend."[171] Plaintiffs' further point to evidence that this was a violation of CHJ policies. For example, Plaintiffs point to evidence

---

[165] Rec. Doc. 126-7 at 29.

[166] Rec. Doc. 18.

[167] *Id.*

[168] Rec. Doc. 126-7 at 127.

[169] *Id.* at 132–166.

[170] Rec. Doc. 126 at 15.

[171] Rec. Doc. 126-8 at 198.

of CHJ's policy stating that the "Level 1" patient designation—which Evans received[172]—"requires that the medical provider evaluate that patient every day when on site."[173] Lastly, Plaintiffs note that Evans was ultimately discharged from suicide watch by Jennings,[174] despite the fact that Jennings was aware that two other detainees, Jerome Bell and Joshua Belcher, had recently died by hanging from their cells after Jennings discharged them from suicide watch.[175] There is also evidence in the record that on September 6, 2017, the day Jennings' discharged Evans from suicide watch, Jennings' was in the infirmary from 9:15 AM and 9:33 AM to speak with six detainees.[176] The CHJ infirmary log book states that during this time, "Social Worker David Jennings speaks with Suicide Inmates backed by Deputy T. Wilkerson."[177] It further states that at 9:33 AM, Jennings took three of the detainees off suicide watch, including Evans.[178]

The Fifth Circuit has explained that a "disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference," and a plaintiff must instead show that a defendant "denied him treatment, ignored his complaints, knowingly treated him incorrectly, or otherwise evidenced a wanton disregard for his serious medical needs."[179] The

---

[172] Rec. Doc. 126-8 at 190.

[173] Rec. Doc. 126-10 at 8.

[174] Rec. Doc. 126 at 15.

[175] *See Belcher v. Lopinto*, 492 F. Supp. 3d 636, 644 (E.D. La. 2020) (Milazzo, J.) (noting that Jerome Bell and Joshua Belcher died by suicide on August 4, 2017 and August 17, 2017, respectively, after being discharged from suicide watch by Jennings).

[176] Rec. Doc. 127-22 at 14–15.

[177] *Id.* at 14.

[178] *Id.* at 15.

[179] *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018).

defendant's conduct "must be 'wanton,' which is defined to mean 'reckless.'"[180] However, deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."[181]

Another section of this Court recently considered a similar claim brought on behalf of Joshua Belcher, who also died by hanging from his cell grate after being discharged from suicide watch by Jennings. In *Belcher v. Lopinto*, the court was faced with the following evidence: (1) Belcher had been placed on suicide watch following a failed suicide attempt; (2) Jennings evaluated Belcher twice while on suicide watch, both of which lasted fewer than twenty minutes; (3) Belcher had been experiencing symptoms of withdrawal while at JPCC; and (4) Jennings knew that another detainee, Jerome Bell, died by hanging two weeks prior after being discharged from suicide watch by Jennings.[182] Considering these facts, the court determined that "a reasonable factfinder could therefore conclude that Jennings drew an inference of a substantial risk of harm to Belcher from the very fact that Belcher's risk of suicide was obvious," and that "by ordering Belcher's discharge from suicide watch with full knowledge of Belcher's high risk of self-harm, a factfinder could easily find that Jennings disregarded that risk."[183] The court went on to find that Jennings' deliberate indifference "emanated from the policies and practices of [CHJ] that were maintained and adopted with objective deliberate indifference."[184]

---

[180] *Baughman v. Hicman*, 935 F.3d 302, 307 (5th Cir. 2019).

[181] *Dryer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

[182] *Belcher v. Lopinto*, 492 F. Supp. 3d 636, 655–56 (E.D. La. 2020) (Milazzo, J.).

[183] *Id.*

[184] *Id.* at 656.

Although *Belcher* is non-binding on this Court,[185] *Belcher* is nevertheless instructive. In fact, Plaintiffs' claim here is even stronger than the plaintiff's in *Belcher*. Here, as in *Belcher*, Jennings knew that Evans had previously attempted suicide.[186] Evans had also reported to Jennings only three weeks earlier that he was experiencing suicidal ideations, that he was hearing voices of his deceased ex-girlfriend, that he had PTSD attributable to his experience serving in Iraq and Afghanistan, and that he rated his depression a ten on a scale of one to ten.[187] Furthermore, whereas the court in *Belcher* found that Jennings' two, twenty minute visits with Belcher during his suicide watch supported a finding of deliberate indifference, the record here demonstrates that Jennings did not meet with Evans at all until the day of discharge.[188] Furthermore, although the record does not reflect how long Jennings spent with Evans that day prior to discharging him, the evidence does indicate that Jennings spent a *total* of eighteen minutes in the infirmary to visit with six detainees, and ultimately discharged three of them including Evans.[189] Lastly, whereas the court in *Belcher* found that Jennings' knowledge of Jerome Bell's suicide following a premature

---

[185] *Belcher* also involved the additional hurdle of demonstrating the existence of a policy or custom that was the moving force behind Jennings' deliberate indifference. Unlike in this case where Plaintiffs sued Jennings and Dr. Lo individually, the plaintiffs in *Belcher* instead sued only CHJ. The Fifth Circuit has made clear that it "employ[s] different standards depending on whether the liability of the individual defendant or the municipal defendant is at issue." *Baughman v. Hickman*, 935 F.3d 302, 207 (5th Cir. 2019). (quoting *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)). "For the individual defendant, the plaintiff must establish that the official(s) acted with subjective deliberate indifference to prove a violation of [her] constitutional rights." *Olabisiomotosho*, 185 F.3d at 527 (internal quotation omitted). However, "[t]o succeed in holding a municipality liable, the plaintiff must demonstrate a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights.'" *Id.* (alteration in original) (quoting *Hare*, 74 F.3d at 649). Therefore, Plaintiffs here can establish a deliberate claim against Jennings individually without demonstrating that Jennings conduct was the result of a municipal policy.

[186] Rec. Doc. 126-7 at 127.

[187] *Id.* at 29

[188] Rec. Doc. 126-8 at 197.

[189] Rec. Doc. 127-22 at 14–15.

discharge from suicide watch supported a finding of deliberate indifference, here Jennings knew

of both Jerome Bell and Joshua Belcher's suicides. Given Jennings knowledge of Evans' mental

health history, his prior suicide attempt, his recent reports of suicidal ideation, and the suicides of

two other inmates following discharge form suicide watch a month prior, the Court is convinced

that a reasonable jury could conclude that Jennings' decision to discharge Evans from suicide

watch after only the most cursory of interactions was sufficiently reckless as to constitute

deliberate indifference.

### 2.    Alleged Deliberate Indifference of Dr. Lo

Plaintiffs also contend that Dr. Lo was deliberately indifferent to Evans' medical needs.[190]

Plaintiffs point to evidence that Dr. Lo was "aware of a number of factors" that increased Evans'

risks of suicide as well as the fact that his condition was getting worse over time.[191] Specifically,

as with Jennings, Plaintiffs point to the medical records demonstrating that Evans was a veteran

with a history of PTSD, he had attempted suicide, he had requested to see a psychiatrist, he

received medication, he expressed suicidal ideations, and that he was suffering from paranoia and

hallucinations and requested stronger medication before he died.[192] Despite this knowledge,

Plaintiffs contend that Dr. Lo was deliberately indifferent to Evans' medical needs because: (1)

Dr. Lo's visits with Evans did not take place in a confidential setting;[193] (2) Dr. Lo failed to

evaluate Evans with the frequency his symptoms required;[194] (3) Dr. Lo "inappropriately"

---

[190] Rec. Doc. 126 at 19.

[191] *Id.* at 19–20.

[192] Rec. Doc. 126-7.

[193] Rec. Doc. 126 at 21.

[194] *Id.*

prescribed Risperdal.[195]

Plaintiffs' complaints about Dr. Lo's treatment, however meritorious, are not sufficient to rise to the level of deliberate indifference. Plaintiffs' claim against Dr. Lo as to the frequency, location, and method of treatment are "classic example[s] of a matter for medical judgment" which are not sufficient to establish a claim for deliberate indifference.[196] As the Fifth Circuit has explained, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a [detainee's] disagreement with his medical treatment, absent exceptional circumstances."[197] A plaintiff must show that the defendant "denied him treatment, ignored his complaints, knowingly treated him incorrectly, or otherwise evidenced a wanton disregard for his serious medical needs."[198] Here, although Plaintiffs contend that Dr. Lo's treatment was incorrect in numerous ways, including by prescribing Evans a medication that, according to Plaintiffs is not approved to treat PTSD,[199] Plaintiffs have not offered any evidence that Dr. Lo did so intentionally. Whether Dr. Lo's treatment of Evans was ultimately negligent, grossly negligent, or even amounted to medical malpractice is not the subject of this motion. However, assuming Dr. Lo's treatment of Evans was inadequate, claims based on "unsuccessful medical treatment, negligence, or medical malpractice" are insufficient to establish a claim for deliberate indifference.[200] Unlike with Jennings, Plaintiffs do not point to evidence that Dr. Lo was

---

[195] *Id.* at 22.

[196] *Dryer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

[197] *Govert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

[198] *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018).

[199] Rec. Doc. 126 at 22.

[200] *Delaughter v. Woodall*, 909 F.3d 130, 137 (5th Cir 2018).

similarly involved in discharging Evans from suicide watch despite the knowledge that two other detainees had recently died by suicide following discharge. Therefore, CHJ Defendants are entitled to summary judgment on Plaintiffs' claim that Dr. Lo acted with deliberate indifference to Evans' medical needs.

**B.      *CHJ's Argument that § 1983 Does not Permit Claims for Vicarious Liability***

CHJ Defendants argue that Plaintiffs' deliberate indifference claim against CHJ in Count 3 should be dismissed because § 1983 does not permit claims for vicarious liability.[201] Plaintiffs respond that although municipalities may not be held vicariously liable, a private company like CHJ can be.[202] As explained above, § 1983 "provides a cause of action against any *person* who deprives an individual of federally guaranteed rights 'under color' of state law."[203] The Supreme Court has held that municipal entities are "persons" under the definition of § 1983.[204] However, the Supreme Court in *Monell v. Department of Social Services of City of New York* held that "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondent superior* theory."[205] Rather, a municipality can be liable under § 1983 "only where the municipality *itself* causes the constitutional violation at issue."[206]

The issue before the Court is whether CHJ—a private company—is considered a

---

[201] Rec. Doc. 67-2 at 11–12.

[202] Rec. Doc. 126 at 30.

[203] *Filarsky*, 566 U.S. at 383 (quoting 42 U.S.C. § 1983) (emphasis added).

[204] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985).

[205] 436 U.S. 658, 691 (1978).

[206] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

municipality for these purposes. Plaintiff points to the Seventh Circuit's decision in *Shields v. Illinois Department of Corrections* in support of its argument that a private corporation can be held liable on a *respondeat superior* theory. In that case, however, the Seventh Circuit began its analysis by noting that under controlling Seventh Circuit precedent, "*respondeat superior* liability does not apply to private corporations under § 1983," but rather such a corporation can be held liable only if "the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself."[207] Acknowledging that the panel was bound by these precedents, the court went on to argue that these precedents should be reconsidered and that private corporations should be liable under a *respondeat superior* theory.[208] Nevertheless, the court acknowledged that all other circuits which have addressed the issue have determined that *respondeat superior* liability does not apply to private corporations providing government services.[209]

As discussed above, to establish a claim under § 1983 the plaintiff must prove that their rights were violated by a person acting under the color of state law.[210] However, "[t]o act 'under color' of law does not require that the accused by an officer of the state."[211] A private company "acts under color of state law 'when that entity performs a function which is traditionally the exclusive province of the state.'"[212] Although the Fifth Circuit has yet to address the issue, every

---

[207] *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014).

[208] *Id.* at 789–96.

[209] *Id*. at 790.

[210] *Rosborough v. Mgmt. & Training Corp*., 350 F.3d 459, 460 (5th Cir. 2003) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988).

[211] *Id*. (quoting *Adickes v. S.H Kress & Co*., 398 U.S. 144, 152 (1970)).

[212] *Id*. (quoting *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989).

circuit to do so,[213] as well as every section of this Court to consider the issue,[214] has determined that like municipalities under *Monell*, a private entity cannot be held vicariously liable under § 1983 for the acts of its employees. Nevertheless, the Court is aware that the Fifth Circuit is currently considering this precise issue on appeal in *Moore v. LaSalle Corrections, Inc.*, a decision from the Western District of Louisiana.[215] Oral argument was held on May 11, 2022. The Court therefore will defer an ultimate ruling as to this argument pending the Fifth Circuit's ruling on this issue. Therefore, at this time, CHJ Defendants are not entitled to summary judgment as to Plaintiffs' claim in Count 3 that Defendant CHJ "is liable . . . under the doctrine of respondeat superior for the constitutional torts of its employees."[216]

## C.   *CHJ Defendants' Argument that Plaintiffs Cannot Recover Punitive Damages*

CHJ Defendants argue that they are entitled to summary judgment on Plaintiffs' request for punitive damages because (1) punitive damages cannot be imposed against a municipal entity such as CHJ and (2) Plaintiffs cannot show that CHJ Defendants acted with "evil motive or intent." The Court will address each argument in turn.

---

[213] *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 408–09 (2d Cir. 1990); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir. 1982); *Street v. Corrections Corp. of America,* 102 F.3d 810, 818 (6th Cir. 1996); *Lux v. Hansen,* 886 F.2d 1064, 1067 (8th Cir. 1989); *Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1139 (9th Cir. 2012); *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 723 (10th Cir. 1988); *Harvey v. Harvey,* 949 F.2d 1127, 1129–30 (11th Cir. 1992). See also *Lyons v. National Car Rental Systems, Inc.,* 30 F.3d 240, 246 (1st Cir.1994); *Defreitas v. Montgomery County Corr. Facility,* 525 Fed. App'x. 170, 176 (3d Cir. 2013).

[214] *Mixon v. Pohlmann*, No. 20-1216, 2021 WL 6072501 at *14 (E.D. La. December 23, 2021) (Morgan, J.); *Walker v. Pohlmann*, No. 20-3464, 2021 WL 2579803 at *6 (E.D. La. June 23, 2021) (Feldman, J); *Belcher v. Lopinto*, 482 F. Supp. 3d 636, 651 (E.D. La. 2020) (Milazzo, J.).

[215] 429 F. Supp. 3d 285 (W.D. La. 2019).

[216] Rec. Doc. 38 at 30. The Court further notes that CHJ Defendants' motion did not argue that there was no CHJ policy or custom that was the moving force behind Evans' constitutional violation. Therefore, the Court need not consider whether a CHJ policy or custom caused Evan's constitutional violation.

### 1.    Whether Punitive Damages May Be Imposed Against CHJ

In *City of Newport v. Fact Concerts, Inc.*, the Supreme Court considered whether a municipality could be held liable for punitive damages under § 1983.[217] The Court ultimately held that municipalities were immune from punitive damages because (1) there was no evidence that Congress intended to displace the "settled common-law" rule that municipalities were immune from such damages and (2) public policy considerations do not support exposing a municipality to punitive damages for the actions of its officials.[218] However, neither the Supreme Court nor any of the Courts of Appeals have decided whether private entities performing government functions are similarly immune from punitive damages under § 1983. Three district courts within the Fifth Circuit have held that such entities are also immune from punitive damages.[219] Nevertheless, the Court is aware that the Fifth Circuit is also considering this issue in the same appeal discussed above.[220] Oral argument was held on May 11, 2022. Therefore, the Court will similarly defer an ultimate ruling as to this argument pending the Fifth Circuit's intervening ruling on this issue.

### 2.    Whether Punitive Damages May be Imposed Against Jennings or Dr. Lo

CHJ Defendants also argue that Plaintiffs cannot recover punitive damages against Jennings or Dr. Lo because there is "nothing to support the notion that [they] were motivated by evil motive or intent in their medical treatment."[221] Plaintiffs respond that there are "genuine issues

---

[217] 43 U.S. 247 (1981).

[218] *Id.* at 271.

[219] *Id. See also Mixon*, 2021 WL 6072501 at *18 (finding the reasoning in *Moore* persuasive and concluding that private entities performing government functions are immune from punitive damages); *Carter v. Gautreaux*, No. 19-105, 2021 WL 2785332 at *6 (M.D. La July 2, 2021) (citing *Moore* without conducting any separate analysis).

[220] *Moore v LaSalle Corrections, Inc.*, 429 F. Supp. 3d 285 (W.D. La. 2019).

[221] Rec. Doc 67-2 at 14.

of material facts as to whether the actions and omissions" by Jennings and Dr. Lo meet the standard for punitive damages.[222]

In *Smith v. Wade*, the Supreme Court held that a jury may award punitive damages in a § 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[223] The Court further noted that this standard applies "even when the underlying standard of liability for compensatory damages is one of recklessness."[224] Although Defendants argue that Plaintiffs cannot demonstrate that Jennings or Dr. Lo acted with "evil motive or intent," Defendants ignore the second half of the Supreme Court's punitive damages standard, allowing recovery of such damages for conduct that involves "reckless or callous indifference to the federally protected rights of others."[225] "The callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability" under 1983.[226] As the Supreme Court explained in *Wade*, "[t]here has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability," and therefore "in situations where the standard for compensatory liability is as high as or higher than the usual threshold for punitive damages, most courts will permit awards of punitive damages without

---

[222] Rec. Doc. 126 at 34.

[223] 461 U.S. 30, 56 (1983).

[224] *Id.*

[225] 461 U.S. 30, 56 (1983).

[226] *Cooper v Dyke*, 814 F.2d 941, 948 (4th Cir. 1987); *Castro v. Cnty of Los Angeles*, 797 F.3d 654, 670 (9th Cir. 2015), *affirmed* 833 F.3d 1060 (9th Cir. 2016) (en banc) (incorporating "by reference the three-judge panel's opinion as to punitive damages.").

requiring any extra showing."[227] Because the "deliberate indifference" and "reckless or callous indifference" standards are essentially the same, CHJ Defendants are not entitled to summary judgment on Plaintiffs' request for punitive damages because the Court has determined that a reasonable jury could find that Jennings' acted with deliberate indifference to Evans' medical needs. However, because the Court has determined that CHJ Defendants' are entitled to summary judgment on Plaintiffs' deliberate indifference claims as to Dr. Lo, they are also entitled to summary judgment on Plaintiffs' request for punitive damages related to his conduct.

---

[227] *Wade*, 461 U.S. at 53.

## V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that CHJ Defendants' "Motion for Summary Judgment On Plaintiffs' 1983 Claims and Request for Punitive Damages"[228] is **GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART**. The motion is **GRANTED** to the extent it seeks summary judgment on Plaintiffs' claim for deliberate indifference against Dr. Lo and Plaintiffs' request for punitive damages as to Dr. Lo's conduct. The motion is **DEFERRED** to the extent it seeks dismissal of Plaintiffs' claims for vicarious liability and punitive damages against CHJ pending the Fifth Circuit's resolution of these issues in a pending appeal. The motion is **DENIED** in all other respects.

**NEW ORLEANS, LOUISIANA,** this ___31st___ day of May, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[228] Rec. Doc. 67.