## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CLINTON EVANS et al.**                          **CIVIL ACTION**

**VERSUS**                                        **NO. 18-8972**

**JOSEPH LOPINTO et al.**                         **SECTION: "G"(1)**

### ORDER AND REASONS

In this litigation, Plaintiffs Clinton Evans and Jeresa Morgan (collectively, "Plaintiffs")
bring claims individually and on behalf of their deceased son, Jatory Evans ("Evans"), against
Defendants CorrectHealth Jefferson ("CHJ"), Jefferson Parish, Sheriff Joseph Lopinto
("Lopinto"), Corrections Administrator and Deputy Chief Sue Ellen Monfra ("Monfra"), Deputy
Christopher Mayeaux ("Mayeaux"), Dr. William Lo ("Dr. Lo"), David Jennings ("Jennings"), and
Ironshore Specialty Insurance Co. ("Ironshore") (collectively, "Defendants").[1] Plaintiffs allege
that Defendants failed to properly monitor Evans while he was incarcerated in Jefferson Parish
Correctional Facility ("JPCC") and that their acts or omissions lead to Evans' death by suicide.[2]
Pending before the Court is Defendants Sheriff Joseph Lopinto, Deputy Chief Sue Ellen Monfra,
and Deputy Christopher Mayeaux's (collectively, "JPSO Defendants") Motion for Summary
Judgment.[3] Considering the motion, the memoranda in support and in opposition, the record, and
the applicable law, the Court grants the motion in part and denies the motion in part.

---

[1] Rec. Doc. 6 at 2–5.

[2] *Id.* at 1.

[3] Rec. Doc. 109.

# I. Background

## A.    *Factual Background*

The Amended Complaint alleges that Evans was a pre-trial detainee in the custody and care of the Jefferson Parish Sheriff's Office at JPCC when he died by hanging in his cell on September 27, 2017.[4] Plaintiffs allege that Evans had an extensive history of PTSD for which he had previously been treated with medication.[5] Plaintiffs aver that Evans reported numerous incidents of mental distress while at JPCC.[6] For example, Plaintiffs assert that Evans was seen by Social Worker David Jennings after reporting that he felt like he was going crazy, could not sleep, and described other PTSD symptoms, and Jennings referred him to a psychiatrist to be evaluated for psychosis.[7] In December 2016, Plaintiffs allege Evans reported that he was having headaches and experiencing feelings of "jitteriness and shaking."[8] In February 2017, Plaintiffs aver that Evans was seen by Jennings after reporting that he was having flashbacks of his deployment to Afghanistan.[9] Plaintiffs assert that Jennings "simply noted that [Evans] was in no acute distress."[10] The following day, Plaintiffs allege that Evans again reported that he was "having visions from [his] Afghanistan events (deployment) and other events," and that he had "painful knots in his

---

[4] Rec. Doc. 38.

[5] *Id.* at 5.

[6] *Id.* at 6.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

arms and legs."[11] Plaintiffs aver that he also reported not being able to sleep.[12] Plaintiffs allege that Evans was not seen by Jennings or Dr. Lo in response to these reports.[13]

Plaintiffs allege that on March 25, 2017, Evans was placed on suicide watch after wrapping a towel around his neck.[14] Plaintiffs aver that the reason for his placement on suicide watch was listed as "severe depression."[15] Plaintiffs contend that Evans was never seen by Dr. Lo or any other psychiatrist while on suicide watch.[16] Rather, Plaintiffs aver that two days after being put on suicide watch, Evans was seen by Jennings, who then discharged Evans.[17] Plaintiffs allege that his discharge did not include any kind of "step-down process," and that Evans did not receive a follow up visit which he was supposed to have a week after discharge.[18]

Plaintiffs aver that on May 10, 2017, Evans reported "multiple nightmares, anxiety issues, depression with [his] thoughts, [and] thinking about [his] own death."[19] Nevertheless, Plaintiffs allege that Evans was not seen by Jennings until May 17.[20] Plaintiffs aver that during this visit, Evans noted that his mother and sister were "the reasons that he did not act on his thoughts of

---

[11] *Id.* at 7.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 8.

[17] *Id.*

[18] *Id.* at 8–9.

[19] *Id.*

[20] *Id.* at 9.

suicide."[21] Nevertheless, Plaintiffs assert that Jennings reported that Evans was in no acute distress.[22]

Plaintiffs allege that on May 28, 2017, Evans requested a mental health referral.[23] Plaintiffs aver that Evans saw Dr. Lo and reported that he was having nightmares and flashbacks.[24] Plaintiffs assert that Dr. Lo noted "an impression of a mood disorder . . . and an anxiety disorder," and prescribed Risperidone.[25] Nevertheless, Plaintiffs allege that Evans "continued to experience significant periods of despondence and expressed to others that a desire to commit suicide was always in the back of his mind."[26] Additionally, Plaintiffs aver that Evans was placed on suicide watch for a second time on September 1, after a member of the defense team reached out to a JPSO deputy expressing concerns that Evans might harm himself.[27] Plaintiffs allege that Evans was seen by Jennings on September 1, and that Jennings "scored his suicide risk as low with a note to follow up with the mental health provider."[28] Plaintiffs allege that he was kept on suicide watch for nearly

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 9–10.

[26] *Id.* at 10.

[27] *Id.*

[28] *Id.*

a week and, although he was seen by nurses, he did not see Jennings or Dr. Lo, nor did he receive counseling or other therapy.[29]

Plaintiffs aver that Jennings discharged Evans on September 6, 2017, stating that Evans told him he was "good," had no intention of harming himself, and had hope for his future.[30] Plaintiffs assert that throughout the rest of September, Evans was in "acute and increasing psychological distress" which Plaintiffs allege other JPCC detainees began to notice.[31] Plaintiffs allege that Evans saw Dr. Lo again on September 14, 2017, during which Dr. Lo increased Evans' medication.[32]

Plaintiffs aver that on the night before he died, Evans expressed his intent to kill himself to other detainees.[33] Furthermore, Plaintiffs allege that he was "very quiet and withdrawn" on the day he died and that other detainees were concerned about his change in behavior.[34] Plaintiffs aver that shortly after roll call on September 27, 2017, Evans blocked the view into his cell with a blanket, in violation of JPSO policy.[35] Nevertheless, Plaintiffs allege that Mayeaux, the guard on duty, did nothing to remove the blanket.[36] Plaintiffs aver that other detainees began to become concerned

---

[29] *Id.*

[30] *Id.* at 11.

[31] *Id.*

[32] *Id.* at 12.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

about Evans, and tried to alert Mayeaux, who was unresponsive.[37] When detainee Furnell Daniel was permitted to leave his cell, approximately an hour after roll call, he learned of the concerns for Evans' safety and went to check on him.[38] Plaintiffs aver that he looked behind the blanket and saw Evans with the sheet around his neck and his head slumped to one side.[39] Plaintiffs allege that he immediately began shouting and motioning to Mayeaux.[40] Thus, Plaintiffs aver that Mayeaux was alerted to Evans' condition no later than between 4:18 and 4:20 PM.[41] Plaintiffs allege that Mayeaux delayed for "at least five to six minutes" before calling for assistance.[42]

## B.   *Procedural Background*

On September 26, 2018, Plaintiffs filed a Complaint in this Court.[43] On December 7, 2018, Plaintiffs filed the First Amended Complaint, which was identical to the original Complaint.[44] On January 24, 2019, Defendant Jefferson Parish filed a Motion to Dismiss and a request for oral argument on the motion.[45] The Court heard oral argument on the Motion to Dismiss on February 27, 2019,[46] and then denied the motion without prejudice and gave Plaintiffs thirty days to amend

---

[37] *Id.* at 13.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Rec. Doc. 1.

[44] Rec. Doc. 6.

[45] Rec. Docs. 16, 17.

[46] Rec. Doc. 22.

the Complaint.[47] On March 27, 2019, Plaintiffs filed a Second Amended Complaint, changing

Plaintiffs' allegations against Jefferson Parish, but maintaining the same allegations against the

other defendants.[48] Thus, the claims involved in this case are outlined below:

- Count 1: Section 1983 claim "Based on Establishment of a System in which Prisoners are Denied Appropriate Protection from Harm" against Defendants Lopinto and JP.[49]

- Count 2: Section 1983 claim "Based on Failure to Supervise other Defendants to Ensure Patients Received Appropriate Care and Supervision to Protect Patients from Harm" against Defendants Lopinto, Monfra, and CHJ. [50]

- Count 3: Section 1983 claim "Based on Deliberate Indifference to Mr. Evans' Constitutional Right to Protection from Harm" against Defendants Lopinto, Monfra, Mayeaux, Lo, Jennings, CHJ, and JP.[51]

- Count 4: Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act "by discriminating against and failing to accommodate a disability" against Lopinto and JP.[52]

- Count 6:[53] *Monell* claim under § 1983 "based on establishment of policies, patterns, or practices pursuant to which inmates with serious mental health conditions are denied access to appropriate medical care and prevention from harm" against Defendants Lopinto, Monfra, and CHJ.[54]

- Count 7: Medical Malpractice claim against Defendants CHJ, Lo, and Jennings.[55]

---

[47] Rec. Doc. 25.

[48] Rec. Doc. 38.

[49] Rec. Doc. 38 at 26–27.

[50] *Id.* at 28–29.

[51] *Id.* at 29–30.

[52] *Id.* at 30–32.

[53] Plaintiffs' Second Amended Complaint mistakenly skips count 5.

[54] Rec. Doc. 38. at 32–33.

[55] *Id.* at 33.

7

- Count 8: Negligence and/or Intentional Tort claim against all Defendants.[56]

On March 6, 2019, CHJ Defendants filed a Motion to Dismiss.[57] The Court denied the motion without prejudice and stayed the case pending the completion of a medical review panel.[58] On July 27, 2021, the Court lifted the stay.[59]

On March 8, 2022, JPSO Defendants filed the instant Motion for Summary Judgment.[60] On May 13, 2022, Plaintiffs opposed the motion.[61] On May 20, 2022, with leave of Court, JPSO Defendants filed a reply.[62]

## II. Parties' Arguments

### A.   *JPSO Defendants' Arguments in Support of the Motion for Summary Judgment*

JPSO Defendants argue that they are entitled to summary judgment on Plaintiffs' claims under § 1983, the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), and state law negligence.

#### 1.   **Section 1983**

JPSO Defendants contend that JPSO does not provide medical treatment to detainees, and therefore cannot be held liable for claims arising out of Evans' medical treatment.[63] Rather, JPSO

---

[56] *Id.* at 34.

[57] Rec. Doc. 27.

[58] Rec. Doc. 54.

[59] Rec. Doc. 57.

[60] Rec. Doc. 109.

[61] Rec. Docs. 134, 154.

[62] Rec. Docs. 141, 156.

[63] Rec. Doc. 109-1 at 8–9.

Defendants contend that CHJ is responsible for providing medical care, and CHJ is the proper entity subject to these claims because it was providing medical care on behalf of the State.[64]

JPSO Defendants argue that all claims against them in their individual capacities must fail, because "Plaintiffs do not allege or show, nor is there any evidence in the record" that JPSO Defendants "participated directly in any of the alleged conduct."[65]

JPSO Defendants also contend that they are entitled to summary judgment on the claims against them in their official capacities.[66] JPSO Defendants argue that such claims must be treated as suits against the municipality, and a claim against a municipality requires proof of both a constitutional violation and that a municipal policy caused the violation. [67] JPSO Defendants argue that Plaintiffs' claims against them fail because Plaintiffs have not proved an underlying constitutional violation.[68] JPSO Defendants contend that Plaintiffs cannot show that a prison official knew of and disregarded an excess risk to Evans' safety.[69] JPSO Defendants argue the record shows that, in the weeks preceding his death, nobody reported to JPCC or CHJ that Evans was suicidal.[70] Therefore, JPSO Defendants contend that because Evans' constitutional rights were

---

[64] *Id.*

[65] *Id.* at 10.

[66] *Id.* at 11.

[67] *Id.*

[68] *Id.* at 13.

[69] *Id.* at 15.

[70] *Id.* at 16.

not violated, "whether the municipality had an official policy or custom that would have authorized any alleged unconditional conduct" is irrelevant.[71]

Alternatively, JPSO Defendants argue that Plaintiffs cannot establish municipal liability for failure to train.[72] JPSO Defendants contend that Plaintiffs must show (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a moving force behind the violation of plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy."[73] JPSO Defendants argue that Plaintiffs claims fail under the first prong because Plaintiffs have not shown that JPSO's training was inadequate, or that any such training contributed to Evans' suicide.[74] Lastly, because JPSO Defendants argue that Plaintiffs have not established an underlying constitutional violation, JPSO Defendants further contend that Plaintiffs cannot show that any training policy was adopted with deliberate indifference.[75]

### 2.      ADA and RA

JPSO Defendants argue that they are entitled to summary judgment on Plaintiffs' claims under the ADA and RA.[76] JPSO Defendants contend that to establish a claim under these statutes, Plaintiffs must show that Evans: (1) had a qualifying disability; (2) was discriminated against by JPSO; and (3) the discrimination was because of his disability.[77] They assert that a plaintiff can

---

[71] *Id.* at 17.

[72] *Id.*

[73] *Id.*

[74] *Id.* at 18.

[75] *Id.* at 18–19.

[76] *Id.* at 19.

[77] *Id.* at 19–20.

satisfy the second prong by showing either that they were treated less favorably than non-disabled individuals, or by showing that the defendant breached its obligation to accommodate that disability.[78] As to the first prong, JPSO Defendants contend that Plaintiffs "do not identify what disability it is that the Defendants failed to accommodate."[79] As to the second prong, JPSO Defendants argue that Plaintiffs cannot show that Evans was discriminated against based on any disability because there is no evidence that Evans was treated differently than non-disabled detainees, nor that Evans ever reported the need for any accommodation.[80]  Defendants also assert that Evans still received constant medical attention.[81] Therefore, JPSO Defendants argue that they are entitled to summary judgment on this claim.[82]

### 3.    Negligence

JPSO Defendants assert that they are entitled to summary judgment on Plaintiffs' negligence claims.[83] First, JPSO Defendants argue that because neither Lopinto nor Monfra had any direct knowledge or participation in these events, any negligence claim against them would be based on vicarious liability for the negligence of a JPSO employee.[84]

JPSO Defendants assert that to establish a negligence claim, Plaintiffs must show the following elements: (1) proof that a JPSO official had a duty of care; (2) proof that the JPSO

---

[78] *Id.* at 21.

[79] *Id.* at 20.

[80] *Id.* at 21.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 22.

[84] *Id.*

officials' conduct failed to conform to the standard of care; (3) proof that the JPSO official's conduct was the cause-in-fact of the plaintiff's injuries; (4) proof that the JPSO officials' conduct was the legal cause of plaintiff's injuries; and (5) proof of actual damages.[85]

JPSO Defendants argue that Plaintiffs have not shown that a JPSO official breached a duty of care owed to Evans.[86] JPSO Defendants further argue that Plaintiffs can't show that the conduct of a JPSO official was the "factual or legal cause" of Evans' suicide.[87] Lastly, JPSO Defendants contend that Plaintiffs cannot prove that the "risk of harm was within the scope of protection afforded by any duty allegedly owed or breached."[88]

### B. *Plaintiffs' Arguments in Opposition to the Motion for Summary Judgment*

#### 1. Section 1983

Plaintiffs argue that Monfra and Lopintio are liable in their individual capacities as supervisors at JPCC.[89] Plaintiff argues that Monfra is responsible for the operations at JPCC, including most of its policies, and reports directly to Lopinto.[90] Plaintiffs further contend that Lopinto has ultimate authority over JPCC.[91] Plaintiffs contend that Monfra was aware prior to Evans' death that inmates who were discharged from suicide watch were returned to their previous cells, and she knew that Belcher and Bell had recently died by suicide in their cells after being

---

[85] Rec. Doc. 109-1 at 22.

[86] *Id.* at 22.

[87] *Id.*

[88] *Id.*

[89] Rec. Doc. 154.

[90] *Id.* at 9.

[91] *Id.* at 9–10.

discharged from suicide watch.[92] Plaintiffs point to deposition testimony that Monfra had conversations with then-Sheriff Normand and others about possibly replacing the grates on the windows to prevent further suicides.[93] Plaintiffs similarly argue that Lopinto was advised of the prior suicides shortly after assuming office on September 1, 2017.[94]

Nevertheless, Plaintiffs argue that JPCC continued to put detainees returning from suicide watch back in their prior cells, without removing the window grates.[95] Plaintiffs contend that it was not until after Evans' suicide that JPCC changed its policy, but argue that there is "no reason why" JPCC could not have changed this policy sooner.[96] Plaintiffs contend that the failure to change this practice sooner directly contributed to Evans' death.[97] Plaintiffs note that Evans "used the same dangerous tie-off point" on the window grate as Bell and Belcher.[98] Based on these facts, Plaintiffs contend that a jury could find that Monfra and Lopinto failed to "adequately direct and supervise their staff in the face of known risks of increased suicide risk which they ignored, by their failure to change JPCC policies and practices with respect to the placement of inmates in cells with poor line of sight from the pod booth upon the inmates' return from suicide watch, and the

---

[92] *Id.* at 1.

[93] *Id.* at 12–13.

[94] *Id.* at 13.

[95] *Id.*

[96] *Id.* at 14.

[97] *Id.* at 15.

[98] *Id.*

failure to remediate the window grates in the cell to which inmates returning form suicide watch were housed."[99]

Plaintiffs further argue that JPSO Defendants are not entitled to summary judgment on its claims against Deputy Mayeaux.[100] Plaintiffs contend that Mayeaux was the "pod officer" on duty when Evans died on September 27, 2021.[101] Plaintiffs argue that Mayeaux was aware that detainees were not allowed to obstruct the entrance to their cells with sheets or blankets, and that it was Mayeaux's practice to make detainees remove them after a few minutes.[102] Nevertheless, Plaintiffs argue that after "roll call" ended at 3:08 PM on September 27, 2017, Evans hung a blanket over his cell.[103] Plaintiffs further argue that when another detainee, Gregory Donald ("Donald"), saw the blanket still up forty five minutes later, he tried to alert Mayeaux.[104] When Mayeaux did not respond, Plaintiffs argue that Donald had another detainee, Furnell Daniel ("Daniel"), check on Evans, who discovered Evans hanging in his cell.[105] Thus, Plaintiffs argue that there was "an extended period of time—sometime soon after roll call at 3:08 and Mayeaux's documentation of Daniel's discovery of [Evans'] body at 4:26—during which [Evans] had obstructed the view of his cell and hanged himself."[106] Plaintiffs argue that this "extended period

---

[99] *Id.* at 16.

[100] *Id.*

[101] *Id.*

[102] *Id.* at 17–18.

[103] *Id.*

[104] *Id.* at 19.

[105] *Id.*

[106] *Id.*

of time constitutes deliberate indifference" because Mayeaux knew that obstructing the cell door was not permitted, and one of the reasons for that rule was to prevent suicides.[107]

As to Plaintiffs' *Monell* claims against JPSO Defendants, Plaintiffs contend that JPSO created dangerous conditions of confinement. Plaintiffs contend that in conditions of confinement cases, a plaintiff need only show objective deliberate indifference. Thus, in order to succeed, Plaintiffs argue that they need only show that JPSO officials knew or should have known that a policy or practice posed an excessive risk of harm to detainees.[108] Plaintiffs argue that JPSO was aware that the window grates posed a danger to detainees, given the prior suicides of Jerome Bell and Joshua Belcher.[109] Plaintiffs also point to testimony from a JPSO officer that Monfra had spoken first with then-Sheriff Normand about replacing the window grates, and subsequently with Sheriff Lopinto, after which "the decision was made that the path was going to continue." [110] Plaintiffs argue that JPSO continued to place detainees coming off suicide watch, including Evans, into cells with "dangerous tie off points."[111]

Plaintiffs argue that various JPSO practices "compounded the danger presented by its failure to remediate" the window grates.[112] First, Plaintiffs argue that JPSO failed to house individuals discharged from suicide watch in cells that have a direct line of sight from the booth

---

[107] *Id.* at 19.

[108] *Id.* at 20–21.

[109] *Id.* at 22.

[110] *Id.* at 22–24.

[111] *Id.* at 25.

[112] *Id.*

where JPSO officers observe them.[113] Second, Plaintiffs argue that JPSO was not equipped to respond to suicide attempts quickly, as they failed to have "cut down tools" to remove a detainee from a hanging bed sheet.[114] Third, Plaintiffs argue that JPSO failed to "develop and implement correction action plans after completed suicides."[115]

Lastly, Plaintiffs argue they can establish a *Monell* claim based on JPSO's failure to train its officers in suicide prevention.[116] Plaintiffs repeat that JPSO did not develop suicide intervention policies following Bell and Belcher's deaths, nor did JPSO provide "scenario[-]based training or drills on responding to suicide attempts in progress."[117]

### 2.    ADA and RA

Plaintiffs argue that JPSO Defendants are not entitled to summary judgment on Plaintiffs' claims under the ADA and RA.[118] Plaintiffs contend that they need only show that Evans was (1) a qualified individual with a disability; (2) was denied the benefits of an available service, program, or activity; and (3) that the denial was due to his disability.[119] Plaintiffs further contend that a defendant is liable under these statutes for the failure to make reasonable accommodations for a disability.[120] Plaintiffs contend that Evans was known to have risk factors for suicide and risk of

---

[113] *Id.* at 26.

[114] *Id.* at 27.

[115] *Id.* at 28.

[116] *Id.* at 30.

[117] *Id.*

[118] *Id.* at 31.

[119] *Id.*

[120] *Id.* at 31–32.

suicide is a "recognized disability that must be accommodated.[121] Plaintiffs also argue that "[r]emoving known ligature points in cells and ensuring adequate supervision are both considered accommodations" for inmates at risk of suicide.[122] Thus, Plaintiffs contend that JPSO Defendants' failure to "place Evans in a cell with appropriate lines of site" and to "remove known tie off points" violated the ADA.[123]

### 3. Negligence

Plaintiffs argue that JPSO Defendants are not entitled to summary judgment on Plaintiffs' negligence claim. Plaintiffs contend that JPSO has a duty to protect detainees from harm, including from self-inflicted injuries.[124] Plaintiffs further argue that Mayeaux breached that duty by failing to adequately observe Evans.[125] Plaintiffs also contend that Lopinto and Monfra breached that duty by allowing detainees discharged from suicide watch to be placed into their former housing units "without accounting for line-of-sight problems."[126] Next, Plaintiffs claim that, because there were multiple "causes" of Evans' suicide, the Court should apply the "substantial factor test" in analyzing causation.[127] Plaintiffs contend that, under this test, where one party's negligence would have caused the injury even in the absence of the other's negligence, all parties are held liable.[128]

---

[121] *Id.* at 33.

[122] *Id.*

[123] *Id.* at 31.

[124] *Id.* at 35.

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.*

17

Plaintiffs further argue that the "scope of duty" element is met where "the injury directly flows from the breach of duty, as where an inmate commits suicide as a result of the sheriff's failure" to keep the inmate safe.[129] As to damages, Plaintiffs state that "there can be no doubt of the losses suffered by Jatory Evans' parents."[130] Lastly, Plaintiffs argue that JPSO is vicariously liable for all acts of negligence because each JPSO official was acting within the course and scope of their employment.[131]

### C.     *JPSO Defendants' Arguments in Further Support of the Motion*

In reply, JPSO Defendants argue that "Plaintiffs must demonstrate that jail personnel acted with subjective deliberate indifference," and there is no evidence that any JPSO official knew of and disregarded Evans' risk of suicide.[132] JPSO Defendants highlight that Evans went to the infirmary on suicide watch on two occasions: March and September of 2017, and the second time was released on September 6, 2017.[133] JPSO Defendants highlight that he was discharged by CHJ with "no restrictions" three weeks prior to his suicide.[134] JPSO Defendants further argue that it is uncontested that Evans did not communicate his intention to harm himself to any JPSO employees.[135] JPSO Defendants further note that Plaintiffs' expert, Dr. Elliot, admitted that he could not point to any evidence that Evans notified anyone at JPSO that he was having suicidal

---

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] Rec. Doc. 156 at 2.

[133] *Id.* at 5.

[134] *Id.*

[135] *Id.*

18

thoughts or ideations between September 6, 2017 and September 27, 2017.[136] Because JPSO employees were not aware of Evans' risk of suicide by September 27, 2017, JPSO Defendants argue that the failure to remediate the risk posed by the window grate is "irrelevant and immaterial" to Plaintiffs' claims. [137]

As to Deputy Mayeaux, JPSO Defendants argue that detainee Gregory Donald's statement was not sworn, constitutes double hearsay, and "is contradicted by the logbook entries from that day, which show security checks being done at 2:00 p.m., 2:30 p.m., 3:08 p.m., 3:30 p.m., and 4:05 p.m."[138] In any event, because JPSO Defendants contend that Mayeaux was not aware that Evans was suicidal, any failure on his part to remove the blanket earlier did not violate Evans' constitutional rights.[139]

JPSO Defendants argue that Plaintiffs have not established a *Monell* violation.[140] JPSO Defendants contend that Plaintiffs are attempting to reclassify their claim as a conditions of confinement claim in order to avoid the subjective deliberate indifference standard.[141] JPSO Defendants contend that in cases where the complained-of conduct involves an official "interposed" between the injured party and the municipal defendant, the case is properly considered an episodic-act case.[142] JPSO Defendants argue that in an episodic-act case, Plaintiffs

---

[136] Rec. Doc. 156-1 at 25.

[137] *Id.*

[138] *Id.* at 7–8.

[139] *Id.*

[140] *Id.* at 11.

[141] *Id.* at 11–12.

[142] *Id.*

must first establish that a JPSO official violated Evans' constitutional rights.[143] Thus, JPSO Defendants again contend that Plaintiffs' *Monell* claims fail because there was no underlying constitutional violation.[144] In any event, JPSO Defendants contend that there was no JPSO policy or custom that was the moving force behind the violation.[145]

### III. Legal Standard

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[146] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[147] All reasonable inferences are drawn in favor of the nonmoving party.[148] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[149] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a

---

[143] *Id.* at 13.

[144] *Id.*

[145] *Id.*

[146] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[147] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[148] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 150).

[149] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

matter of law.[150] The nonmoving party may not rest upon the pleadings.[151] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[152]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[153] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[154] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[155] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[156]

---

[150] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cites Serv. Co.,* 391 U.S. 253, 289 (1968)).

[151] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[152] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[153] *Celotex*, 477 U.S. at 323.

[154] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[155] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[156] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[157] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[158]

## IV. Analysis

In the instant motion, JPSO Defendants move for summary judgment on all claims asserted against them. The Court will address each in turn.

### A.   Section 1983 Claims

Title 42, Section 1983 of the United States Code provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."[159] "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[160] Thus, to establish a claim under § 1983, a plaintiff must establish (1) a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person

---

[157] *Little*, 37 F.3d at 1075 (internal citations and quotation marks omitted).

[158] *Morris*, 144 F.3d at 380.

[159] *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).

[160] *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

acting under color of state law.[161]

      To assert a § 1983 claim against a municipality rather than an individual, a plaintiff must establish both (1) "that a constitutional violation occurred" and (2) "that a municipal policy was the moving force behind the violation."[162] "When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission."[163] However, "when [an official's] actions were interposed between the [municipality] and the decedent, it [is] clear that the case was one for an episodic act or omission."[164] Specifically, the Fifth Circuit has treated claims related to suicides at jails as episodic claims.[165]

      To establish municipal liability in an episodic act case, a plaintiff must show "(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference."[166] "A policy or custom

---

[161] *Randolph v. Cervantes*, 130 F.3d 727, 730 (5th Cir. 1997).

[162] *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901, 208 L. Ed. 2d 455 (2020).

[163] *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019).

[164] *Woodward v. Lopinto*, No. 18-4236, 2021 WL 1969446, at *3 (E.D. La. May 17, 2021) (citing *Anderson v. Dall. Cnty.*, 286 Fed. App'x 850, 858 (5th Cir. 2008)).

[165] *Anderson*, 286 Fed. App'x at 858 (citing *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997); *Sibley v. Lemaire*, 184 F.3d 481, 485 (5th Cir.1999)).

[166] *Garza*, 922 F.3d at 634 (quoting *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)) (internal quotation marks omitted).

may be attributed to a municipal defendant through the identification of a final policymaking authority."[167]

### 1.      Individual Capacity Claims

#### a.      Mayeaux

Plaintiffs' claims against Deputy Mayeaux "are based on [his] duties as the 'pod officer' . . . on the evening watch of September 27, 2017" when Evans died.[168] Plaintiffs have pointed to evidence suggesting that Mayeaux was indeed the "pod officer" on watch on the day that Evans died.[169] Plaintiffs have also pointed to deposition testimony of a JPSO officer who explained that there is a "rule[] that no cell gate or window is to be covered or used as an item to block the mechanism of a cell gate."[170] When asked why detainees are not permitted to block their cells, the officer testified as follows:

> [I]t prevent[s] the officer [from] visually observing what they are doing in their cells. Okay. Now, could it be a suicide attempt, could it be other reasons for why they trying to cover their cell, possibly, but we must maintain visual on these inmates as much as we can.[171]

Plaintiffs also point to Mayeaux's deposition testimony that if a blanket or sheet was blocking the doorway "for long enough, I've known to open up the food slot, holler in to take the sheet down. If they don't take the sheet down, I'll call for someone to come in."[172]

---

[167] *Id.* at 637.

[168] Rec. Doc. 154 at 16.

[169] Rec. Doc. 154-4 at 94.

[170] Rec. Doc. 154-3 at 175.

[171] *Id.* at 176.

[172] Rec. Doc. 154-4 at 60.

Plaintiffs further point to evidence that, during the investigation into Evans' death, several detainees stated that Evans put the blanket up at or around the end of roll call,[173] which, according to the log book, was completed at 3:08 PM.[174] Detainee Gregory Donald stated that after roll call he read his bible "for about 45 minutes" when he noticed that Evans' blanket was still covering his cell, and yelled for Mayeaux to "call medical!"[175] When Mayeaux did not respond, Donald asked another detainee, Furnell Daniels ("Daniels"), to check on Evans.[176] Evidence from the logbook indicates that Mayeaux documented that Daniels reported that Evans was hanging in his cell at 4:26.[177] JPSO Defendants dispute this evidence by suggesting that Donald's statement that the blanket was up for forty-five minutes is "not sworn and is double hearsay" and is "contradicted by the logbook entries from that day, which show security checks being done at 2:00 p.m., 2:30 p.m., 3:08 p.m., 3:30 p.m., and 4:05 p.m.[178] Although the Court acknowledges the logbook entries, there is other evidence corroborating that the blanket remained up for an extended period of time. In addition to Donald's statement, detainee John Hunter ("Hunter") stated that as soon as the deputy conducting roll call left, "the blanket went up."[179] Hunter then stated that "about an hour maybe an hour and a half later everybody started screaming" when another detainee discovered

---

[173] Rec. Doc. 154-5 at 3; Rec. Doc. 154-6 at 3.

[174] Rec. Doc. 126-15 at 37.

[175] Rec. Doc. 154-5 at 5.

[176] *Id.*

[177] Rec. Doc. 126-15 at 37.

[178] Rec. Doc. 156 at 7–8.

[179] Rec. Doc. 154-6 at 3.

Evans hanging.[180] In addition, Detainee Randy Mayer ("Mayer") stated that "[a]fter roll call [Evans'] blanket went up."[181] When asked whether the blanket "remain[ed] up," Mayer responded "yes."[182]

Therefore, there is a dispute of fact as to how long the blanket was covering Evans' cell, which the Court cannot resolve in a motion for summary judgment. That the statements by Donald and other detainees are not sworn and may constitute hearsay does not preclude the Court from considering them in opposition to a motion for summary judgment. Even assuming that these statements constitute double hearsay, and without considering whether any exceptions apply, the Court may consider hearsay on a motion for summary judgment if it is capable "of being presented in an admissible form at trial."[183] The Court has no reason to believe that these statements could not be presented in an admissible form at trial, for example, by live testimony from these individuals. Therefore, there is a genuine dispute of material fact as to how long Evans' blanket was covering his cell before Mayeaux discovered it.

JPSO Defendants argue that Mayeaux's failure to remove the blanket earlier is irrelevant to Plaintiffs' claims because there is no evidence that Mayeaux "had actual knowledge that Evans was suicidal and effectively disregarded the risk."[184] As to Mayeaux's knowledge, Plaintiffs point to his deposition testimony that he knew Evans, and that they had spoken about their military

---

[180] *Id.* at 3–4.

[181] Rec. Doc. 154-7 at 3.

[182] *Id.*

[183] *See Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 524 n.1 (5th Cir. 2022).

[184] Rec. Doc. 156 at 8.

backgrounds and deployments.[185] Mayeaux also testified that he had military colleagues who had struggled with suicide.[186] In addition, as explained in more detail below, the JPSO log book reflects that in March of 2017, JPSO officers found Evans "with a piece of fabric tied around his neck on his cell gate" and Evans was "leaning away from the gate causing the fabric to . . . tighten[] in an attempt to restrict airflow."[187] On a motion for summary judgment, the Court refrains from making credibility determinations or weighing the evidence,"[188] and the Court is required to draw "all reasonable inferences" in Plaintiffs' favor.[189] Viewing the evidence in this light, the Court cannot say that a reasonable jury could not conclude that Mayeaux knew of and disregarded a risk to Evans' safety. Therefore, JPSO Defendants are not entitled to summary judgment on this claim.

> b.   *Lopinto and Monfra*[190]

Plaintiffs appear to assert that Lopinto and Monfra are liable in their individual capacities as supervisors at JPCC. As stated by Plaintiffs, the claims against Lopinto and Monfra are that they "fail[ed] to adequately direct and supervise their staff in the face of known risks of increased suicide risk which they ignored, by their failure to change JPCC policies and practices with respect to the placement of inmates in cells with poor line of sight from the pod booth upon the inmate's return from suicide watch, and the failure to remediate the window grates in the cells to which

---

[185] Rec. Doc. 154-4 at 84.

[186] *Id.* at 19–20.

[187] Rec. Doc. 126-18.

[188] *Delta & Pine Land Co.*, 530 F.3d at 398–99.

[189] *Turner*, 476 F.3d at 343.

[190] Because Plaintiffs' brief discusses Lopinto and Monfra together, the Court will do so as well.

inmates returning from suicide watch were housed."[191] Essentially, Plaintiffs contend that both Lopinto and Monfra had the authority to make changes at JPCC, and that their failure to address the risks of window grates to detainees returning from suicide watch allowed Evans to be put in a cell from which he could hang himself.[192]

"Well settled Section 1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates' actions."[193] Instead, supervisory officials may only be held liable if: (1) "they affirmatively participate in acts that cause constitutional deprivation;" or (2) "implement unconstitutional policies that causally result in plaintiff's injury."[194] "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates."[195] In a § 1983 claim for the failure to supervise or train, the plaintiff must show that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."[196]

Here, Plaintiffs provide evidence that Monfra and Lopinto were aware of the problems with the window grates but nevertheless failed to have them removed or otherwise instruct JPSO

---

[191] Rec. Doc. 154 at 16.

[192] *Id.*

[193] *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992).

[194] *Id.*

[195] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (emphasis and alterations in original).

[196] *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

officials not to place detainees leaving suicide watch in these cells. Specifically, Plaintiffs point to

the following excerpt from Monfra's deposition explaining what would happen when somebody

was released from suicide watch:

> [T]ypically, when they left medical, if they were assigned to the infirmary, to the best of my recollection, and they were taken off of suicide watch, then they were cleared to go back to, again, the housing unit, that we would—if their classification were noted—ensure that we put them in the correct housing.[197]

Furthermore, in response to being asked whether CHJ would instruct the "security staff or the

classification staff" whether they would recommend where a person should be housed upon

release, Monfra testified as follows:

> I would tell you no. What medical's responsibility would be, would be to notify classification and/or those that are involved and let them know what the situation is as far as the individual coming off of suicide watch. . . . [M]edical doesn't designate where we necessarily put someone when they come back to a specific cell. Those designations would be made by JPCC staff.[198]

Plaintiffs further point to Monfra's deposition testimony where she states that she was aware of

both Belcher and Bell's suicides, had conversations about "what, if anything, we could have done

differently,"[199] but nevertheless did not see the need for additional training or a change in policy.[200]

There is also evidence in the record that Lopinto was made aware of the dangers of the window

grates, as Major Olson testified that Monfra "had a conversation" with Lopinto, and the "decision

was made" to continue "reviewing the expanded metal and changing it to something different."[201]

---

[197] Rec. Doc. 127-8 at 56.

[198] *Id.* at 60.

[199] *Id.* at 161.

[200] *Id.* at 159, 161.

[201] Rec. Doc. 127-7 at 237.

Given this evidence, a reasonable jury could conclude that Monfra and Lopinto's failure to train JPSO officials not to put detainees recently discharged from suicide watch into those cells was sufficiently reckless as to constitute deliberate indifference, and that there is a "causal link" between this failure to train and Evans' death.

JPSO Defendants argue that Plaintiffs' claims against Monfra and Lopinto must fail because there is no evidence that JPSO officials knew that Evans was suicidal. The Court disagrees. JPSO officials knew that Evans was put on suicide watch for the first time on March 24, 2017, after a JPSO Deputy saw Evans "with a piece of fabric tied around his neck on his cell gate" where Evans was "leaning away from the a gate causing the fabric to . . . tighten[] in an attempt to restrict airflow."[202] JPSO officials also knew that he was placed on suicide watch a second time on September 1, 2017, and discharged on September 6, 2017. Although JPSO Defendants argue that JPSO officials were not aware that he was suicidal because he was removed from suicide watch by CHJ, a reasonable jury could find otherwise. Whether JPSO officials had the requisite knowledge of Evans' risk of suicide "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that [JPSO officials] knew of a substantial risk from the very fact that the risk was obvious."[203] Therefore, JPSO Defendants are not entitled to summary judgment as to Plaintiffs' claims against Monfra and Lopinto.

### 2. Official Capacity Claims

As explained above, § 1983 "provides a cause of action against any *person* who deprives

---

[202] Rec. Doc. 126-18.

[203] *Farmer v. Brennan*, 511 U.S. 825, 840 (1994) (internal citations omitted).

an individual of federally guaranteed rights 'under color' of state law."[204] The Supreme Court has held that municipal entities are "persons" under the definition of § 1983.[205] When state officials are sued in their official capacities, the claims are treated "as a suit against the entity."[206] The Supreme Court in *Monell v. Department of Social Services of the City of New York* held that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondent superior* theory."[207] Rather, a municipality can be liable under § 1983 "only where the municipality *itself* causes the constitutional violation at issue."[208] Therefore, in addition to showing that a detainee's constitutional rights were violated, Plaintiffs must establish that "a municipal policy was the moving force behind the violation."[209]

"When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission."[210] The Fifth Circuit has distinguished the two as follows.

A condition of confinement claim is "a challenge to general conditions, practices, rules, or restrictions of pretrial confinement."[211] Notably, "[i]n some cases, a condition may reflect an

---

[204] *Filarsky*, 566 U.S. at 383 (quoting 42 U.S.C. § 1983) (emphasis added).

[205] *Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)).

[206] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[207] *Monell*, 436 U.S. at 691.

[208] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

[209] *Sanchez*, 956 F.3d at 791.

[210] *Garza*, 922 F.3d at 632.

[211] *Est. of Henson v. Wichita Cnty.*, 795 F.3d 456, 463 (5th Cir. 2015) (citing *Hare v. City of Corinth*, 74 F.3d

31

unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'"[212] In analyzing such claims, "the proper inquiry is whether those conditions amounted to punishment of the detainee."[213] "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."[214] In sum, therefore, a plaintiff must prove three elements to establish an unconstitutional conditions of confinement claim: "(1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights."[215] A plaintiff "need not demonstrate that the state actor or municipal entity acted with intent to punish."[216]

By contrast, an episodic acts or omissions claim "faults specific jail officials for their acts or omissions."[217] "In such a case, an actor is interposed between the detainee and the municipality,

---

633, 644 (5th Cir. 1996)) (internal quotation marks omitted).

[212] *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (alteration in original) (quoting *Hare*, 74 F.3d at 645).

[213] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[214] *Id.* at 539.

[215] *Montano v. Orange Cnty.*, 842 F.3d 865, 874 (5th Cir. 2016) (quoting *Est. of Henson.*, 795 F.3d at 468) (internal quotation marks omitted).

[216] *Est. of Henson*, 795 F.3d at 463.

[217] *Shepherd*, 591 F.3d at 452.

32

such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission."[218] A plaintiff proving a violation of their constitutional rights under an episodic acts or omission claim must establish that officials acted "with subjective deliberate indifference."[219] A showing of deliberate indifference requires that "the state official must know of and disregard an excessive risk to inmate health or safety" and must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[220]

Plaintiffs argue that JPSO is liable under *Monell* because the window grates from which Evans and others hung themselves was a dangerous condition of confinement.[221] In response, JPSO Defendants argue that Plaintiffs' claim is properly considered an "episodic act or omission" claim, rather than a condition of confinement claim.[222] The Court agrees. "[W]hen [an official's] actions were interposed between the municipality and the decedent, it [is] clear that the case was one for an episodic act or omission."[223] Thus, the Fifth Circuit considers claims related to suicides at jails as episodic claims.[224] Plaintiffs' claim is that JPSO officials failed to remediate the danger posed by the window grates from which detainees had hung themselves. Thus, Plaintiffs' claims

---

[218] *Est. of Henson*, 795 F.3d at 463 (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)) (internal quotation marks omitted).

[219] *Garza*, 922 F.3d at 634.

[220] *Est. of Henson*, 795 F.3d at 464 (internal citations and quotation marks omitted).

[221] Rec. Doc. 22.

[222] Rec. Doc. 156 at 11–12.

[223] *Woodward*, 2021 WL 1969446, at *3 (citing *Anderson*, 286 Fed. App'x at 858).

[224] *Anderson*, 286 Fed. App'x at 858 (citing *Flores*, 124 F.3d at 738; *Sibley*, 184 F.3d at 485).

necessarily involve faulting JPSO officials for their failure to act, and the JPSO officials are thereby "interposed between the detainee and the municipality."[225]

Nevertheless, construing Plaintiffs claim under an episodic acts theory, a reasonable jury could find JPSO liable. As explained above, to establish municipal liability in an episodic act case, a plaintiff must demonstrate that the detainee's constitutional violation "resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference."[226] To do so, a plaintiff must show three things: (1) an "official policy or custom 'was a cause in fact of the deprivation of rights inflicted,'"[227] (2) the policy "served as a moving force" behind the constitutional violation,[228] and (3) the policy was decided on by a policymaker with "either actual or constructive knowledge of the alleged policy."[229] There are three ways to show a municipal policy or custom: "(1) [an] express policy of violating the Constitution, (2) a widespread practice or custom—even if that custom has not received formal approval by an official decision-making body—or (3) a decision by an individual with express policy-making authority."[230] The question of who has express policy-making authority is a question of state law.[231]

---

[225] *See Est. of Henson*, 795 F.3d at 463.

[226] *Garza*, 922 F.3d at 634 (quoting *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)) (internal quotation marks omitted).

[227] *Spiller v. City of Tex. City*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

[228] *Id.* (internal citations and quotation marks omitted).

[229] *Cox v. City of Dall.*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001)).

[230] *Cardenas v. Lee Cnty.*, 569 Fed. App'x 252, 255 (5th Cir. 2014) (citing *Monell*, 436 U.S. at 690–91).

[231] *Webb. v. Town of St. Joseph*, 925 F.3d 209, 215 (5th Cir. 2019).

Under Louisiana law, sheriffs are policymakers with respect to the management of jails.[232] However "a municipal employee may also possess final policy making authority where the final policymaker has delegated that authority, either expressly or impliedly."[233] Here, Plaintiffs point to evidence suggesting that policymaking authority at JPCC has been delegated to Deputy Monfra. Plaintiffs point to Monfra's deposition testimony where she states that she is the "Correction Administrator" of JPCC, is "responsible for the overall operations of the facility," and reports directly to the Sheriff.[234] When asked about her role in the formulation or revision of policy she explained:

> Major Olsen will discuss something with me . . . I will get with him and ask him to put together a policy, we'll discuss it, and I'll review it, and then we'll put it into policy.[235]

Monfra further testified that although she reports to the Sheriff, she is not required to get his approval prior to instituting new policy or revising an old policy.[236] As discussed in detail above, another JPSO official testified that in 2017, JPCC policy was that detainees being released from suicide watch would "go back to the pod unit that [they] came from."[237] Furthermore, Monfra testified that she was aware of both Belcher and Bell's suicides, had conversations about "what, if

---

[232] *See, e.g.*, *Belcher v. Lopinto*, 492 F. Supp. 3d 636, 659 (E.D. La. 2020) (Milazzo, J.); *Louviere v. St. Tammany Par. Gov't*, No. 20-1840, 2021 WL 1601495, at *4 (E.D. La. April 23, 2021) (Vitter, J.).

[233] *Webb*, 925 F.3d at 215.

[234] Rec. Doc. 127-8 at 12, 26.

[235] *Id.* at 25.

[236] *Id.*

[237] Rec. Doc. 154-3 at 146.

anything, could have done differently,"[238] but nevertheless did not change the policy at the time.[239]

Therefore, Plaintiffs have presented evidence that a JPSO official with policymaking authority (Monfra) made a decision to maintain a policy whereby detainees returning from suicide watch were placed back in their original cells, without taking any precautions to mitigate the risk posed by the window grates. A reasonable jury could find that the decision to maintain this policy, in light of the two other recent suicides, was deliberately indifferent and was the moving force behind Evans' suicide. Therefore, JPSO Defendants are not entitled to summary judgment on Plaintiffs' *Monell* claim.

**B.     *ADA and RA Claims***

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[240] Similarly, Section 504 of the Rehabilitation Act provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."[241] The Fifth Circuit has explained that although both statutes "prohibit . . . discrimination against qualified individuals with disabilities . . . the statutes govern different entities: the ADA applies only to public entities, including private employers, whereas

---

[238] *Id.* at 161.

[239] Rec. Doc. 127-8 at 159, 161.

[240] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting 42 U.S.C. § 12132).

[241] *Id.* (quoting 29 U.S.C. § 794(a)).

the RA prohibits discrimination in federally-funded programs and activities."[242] Nevertheless, the Fifth Circuit has explained that the two are "judged under the same legal standards and the same remedies are available under both Acts."[243]

To prevail under these statutes, a plaintiff must establish: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.[244] The Fifth Circuit has recognized that these statutes also "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals."[245] "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations."[246] The second prong of this test is "ordinarily satisf[ied] . . . by showing that [an individual] identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms."[247]

Here, Plaintiffs' claims under the ADA and RA fail. Even assuming that Evans' risk of suicide was a qualifying disability, there is no evidence that Evans or his family requested an accommodation. "The burden falls on the plaintiff to identify the disability, the limitation, and to

---

[242] *Kemp v. Holder*, 610 F.3d 231, 234–35 (5th Cir. 2010).

[243] *Id.*

[244] *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

[245] *Smith v. Harris Cnty.*, 956 F.3d 311, 318 (5th Cir. 2020).

[246] *Id.* (quoting *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015)).

[247] *Id.*

request an accommodation in 'direct and specific' terms."[248] Because there is no evidence that Evans or his family requested an accommodation, JPSO "cannot be held liable for failing to provide one."[249] Accordingly, JPSO Defendants are entitled to summary judgment on Plaintiffs' claims under ADA and RA.

**C.    *Negligence***

In actions for negligence, Louisiana law requires the plaintiff to show the following five elements:

(1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).[250]

JPSO Defendants dispute, in a cursory fashion, all but the fifth element. The entirety of JPSO Defendants' argument as to negligence is a follows:

First, Plaintiffs have failed to allege or show that any agent or employee of the JPSO had a duty of care to Evans that was breached. Second, Plaintiffs have failed to allege or show that any action or inaction by any employee or agent of the JPSO Defendants was the factual or legal cause of the Evans[] suicide. Third, Plaintiffs have failed to allege or prove that the risk of harm was within the scope of protection afforded by any duty allegedly owed or breached.[251]

The Court addresses each of the challenged elements in turn.

---

[248] *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021).

[249] *Edwards v. Wal-Mart Stores, Inc.*, 247 F.3d 241, 2001 WL 43546 at *2 (5th Cir. 2001).

[250] *Long v. State ex rel. Dep't of Transp. & Dev.*, 04-485 (La. 6/29/05); 916 So. 2d 87, 101.

[251] Rec. Doc. 109-1 at 22.

*1.    Duty*

Whether a duty exists in a particular set of circumstances is a question of law for the Court to decide.[252] The relevant inquiry is "whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty."[253] Under Louisiana law, "a sheriff . . . owes a general duty to a prisoner to save him from harm and the officer is liable for the prisoner's injury or death resulting from a violation of such a duty."[254] This duty "extends to protecting inmates from self-inflicted injury."[255] Therefore, under Louisiana law, JPSO Defendants owed Evans a duty.

*2.    Breach*

The "breach of a duty is a question of fact."[256] "Generally, breach of a duty is the failure to exercise reasonable care under the circumstances."[257] The Fifth Circuit has explained that "the use of summary judgment is rarely appropriate in negligence . . . cases, even where the material facts are not disputed."[258] That is because "it is usually for the jury to decide whether the conduct in question meets the reasonable man standard."[259]

---

[252] *Mathieu v. Imperial Toy Corp.*, 94-952 (La. 11/30/94); 646 So. 2d 318, 322.

[253] *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (quoting *Faucheaux v. Terrebonne Consol. Gov't*, 92-930 (La. 2/22/93); 615 So. 2d 289, 292.

[254] *Barlow v. City of New Orleans*, 241 So. 2d 501, 504 (La. 1970). *See also Nagle v. Gusman*, 61 F. Supp. 3d 609, 620–21 (E.D. La. 2014) (Vance, J.) (finding that an Orleans Parish deputy owed a duty to a detainee who died by suicide while under the deputy's supervision).

[255] *Misenheimer v. W. Baton Rouge Par. Sheriff's Off.*, No. 95-2427 (La. App. 1 Cir. 6/28/96); 677 So. 2d 159, 161. *See also Nagle*, 61 F. Supp. at 621.

[256] *D.C. v. St. Landry Par. Sch. Bd.*, No. 01-1304 (La. App. 3 Cir 3/7/01); 802 So. 2d 19, 22.

[257] *Id.* (quoting Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law 6-1 at 139 (1996)).

[258] *Davidson v. Stanadyne, Inc.*, 718 F.2d 1334, 1338–39 (5th Cir. 1983).

[259] *Matthews v. Ashland Chem., Inc.*, 703 F.2d 921, 925 (5th Cir. 1983).

Plaintiffs contend that there is sufficient evidence that Mayeaux, Monfra, and Lopinto breached the duty of care owed to Evans. The Court agrees that a reasonable jury could find that these defendants breached their duties of care. Negligence is, of course, an easier burden to meet than deliberate indifference.[260] As discussed at length above, Plaintiffs offer evidence that Monfra and Lopinto failed to implement policy changes despite the fact that two other detainees had recently died by suicide using the window grates in their cells. Furthermore, Plaintiffs have offered evidence suggesting that Mayeaux failed to remove a blanket covering Evans' cell in a timely manner, in violation of JPCC policy. A reasonable jury could find that this conduct breached the duty of care each defendant owed to Evans.

### 3.   Cause in Fact

Under Louisiana law, "[w]here there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident."[261] "Whether the defendant's conduct was a substantial factor in bringing about the harm, and, thus, a cause-in-fact of the injuries, is a factual question to be determined by the factfinder."[262] Therefore, given that JPSO Defendants do not articulate any argument as to why Monfra and Mayeaux's conduct was not a substantial factor in Evans' suicide, the Court finds that JPSO Defendants are not entitled to summary judgment on this basis. A reasonable jury could conclude that Mayeaux and Monfra's conduct were "substantial factors" in Evans' suicide.

---

[260] *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence.").

[261] *Perkins v. Entergy Corp.*, No. 00-1372 (La. 3/23/01); 782 So. 2d 606, 611.

[262] *Id.*

4.       *Scope of Protection*

The scope of protection element asks whether the "plaintiff's injury was one of the risks encompassed by the rule of law that imposed the duty."[263] As discussed above, Louisiana law imposes a "general duty to a prisoner to save him from harm,"[264] including from "self-inflicted injury."[265] Evans' suicide was clearly within the scope of the risk imposed by the duty. Therefore, JPSO Defendants are not entitled to summary judgment on this claim.

## V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that JPSO Defendants' Motion for Summary Judgment[266] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** to the extent that it seeks dismissal of Plaintiffs' claims under the ADA and RA. The motion is **DENIED** in all other respects.

**NEW ORLEANS, LOUISIANA**, this  24th  day of June, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[263] *See, e.g.*, *Nagle*, 61 F. Supp. 3d at 625; *Faucheaux*, 615 So. 2d at 293–294.

[264] *Barlow*, 241 So. 2d at 504. *See also Nagle*, 61 F. Supp. 3d at 620–21 (finding that an Orleans Parish deputy owed a duty to a detained who died by suicide while under the deputy's supervision).

[265] *Misenheimer*, 677 So. 2d at 161. *See also Nagle*, 61 F. Supp. at 621.

[266] Rec. Doc. 109.