**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CLINTON EVANS et al.**                                    **CIVIL ACTION**

**VERSUS**                                                           **NO. 18-8972**

**JOSEPH LOPINTO et al.**                                  **SECTION: "G"(1)**

## <u>ORDER AND REASONS</u>

In this litigation, Plaintiffs Clinton Evans and Jeresa Morgan (collectively, "Plaintiffs")
bring claims individually and on behalf of their deceased son, Jatory Evans ("Evans"), against
Defendants CorrectHealth Jefferson ("CHJ"), Jefferson Parish, Sheriff Joseph Lopinto
("Lopinto"), Corrections Administrator and Deputy Chief Sue Ellen Monfra ("Monfra"), Deputy
Christopher Mayeaux ("Mayeaux"), Dr. William Lo ("Dr. Lo"), David Jennings ("Jennings"), and
Ironshore Specialty Insurance Co. ("Ironshore") (collectively, "Defendants").[1] Plaintiffs allege
that Defendants failed to properly monitor Evans while he was incarcerated in Jefferson Parish
Correctional Facility ("JPCC") and that their acts or omissions lead to Evans' death by suicide.[2]
Pending before the Court is Defendants CHJ, Ironshore, Jennings, Dr. Lo and Ironshore's
(collectively "CHJ Defendants") "Motion for Summary Judgment On Plaintiffs' State Law
Claims."[3] Considering the motion, the memoranda in support and in opposition, and the applicable
law, the Court grants the motion in part and denies it in part.

---

[1] Rec. Doc. 6 at 2–5.

[2] *Id.* at 1.

[3] Rec. Doc. 112.

1

## I. Background

### *A.    Factual Background*

The Amended Complaint alleges that Evans was a pre-trial detainee in the custody and care of the Jefferson Parish Sheriff's Office at JPCC when he died by hanging in his cell on September 27, 2017.[4] Plaintiffs allege that Evans had an extensive history of PTSD for which he had previously been treated with medication.[5] Plaintiffs aver that Evans reported numerous incidents of mental distress while at JPCC.[6] For example, Plaintiffs assert that Evans was seen by Social Worker David Jennings after reporting that he felt like he was going crazy, could not sleep, and described other PTSD symptoms, and Jennings referred him to a psychiatrist to be evaluated for psychosis.[7] In December 2016, Plaintiffs allege Evans reported that he was having headaches and experiencing feelings of "jitteriness and shaking."[8] In February 2017, Plaintiffs aver that Evans was seen by Jennings after reporting that he was having flashbacks of his deployment to Afghanistan.[9] Plaintiffs assert that Jennings "simply noted that [Evans] was in no acute distress."[10] The following day, Plaintiffs allege that Evans again reported that he was "having visions from [his] Afghanistan events (deployment) and other events," and that he had "painful knots in his

---

[4] Rec. Doc. 38.

[5] *Id.* at 5.

[6] *Id.* at 6.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

arms and legs."[11] Plaintiffs aver that he also reported not being able to sleep.[12] Plaintiffs allege that Evans was not seen by Jennings or Dr. Lo in response to these reports.[13]

Plaintiffs allege that on March 25, 2017, Evans was placed on suicide watch after wrapping a towel around his neck.[14] Plaintiffs aver that the reason for his placement on suicide watch was listed as "severe depression."[15] Plaintiffs contend that Evans was never seen by Dr. Lo or any other psychiatrist while on suicide watch.[16] Rather, Plaintiffs aver that two days after being put on suicide watch, Evans was seen by Jennings, who then discharged Evans.[17] Plaintiffs allege that his discharge did not include any kind of "step-down process," and that Evans did not receive a follow up visit which he was supposed to have a week after discharge.[18]

Plaintiffs aver that on May 10, 2017, Evans reported "multiple nightmares, anxiety issues, depression with [his] thoughts, [and] thinking about [his] own death."[19] Nevertheless, Plaintiffs allege that Evans was not seen by Jennings until May 17.[20] Plaintiffs aver that during this visit, Evans noted that his mother and sister were "the reasons that he did not act on his thoughts of

---

[11] *Id.* at 7.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 8.

[17] *Id.*

[18] *Id.* at 8–9.

[19] *Id.*

[20] *Id.* at 9.

suicide."[21] Nevertheless, Plaintiffs assert that Jennings reported that Evans was in no acute distress.[22]

Plaintiffs allege that on May 28, 2017, Evans requested a mental health referral.[23] Plaintiffs aver that Evans saw Dr. Lo and reported that he was having nightmares and flashbacks.[24] Plaintiffs assert that Dr. Lo noted "an impression of a mood disorder . . . and an anxiety disorder," and prescribed Risperidone.[25] Nevertheless, Plaintiffs allege that Evans "continued to experience significant periods of despondence and expressed to others that a desire to commit suicide was always in the back of his mind."[26] Additionally, Plaintiffs aver that Evans was placed on suicide watch for a second time on September 1, after a member of the defense team reached out to a JPSO deputy expressing concerns that Evans might harm himself.[27] Plaintiffs allege that Evans was seen by Jennings on September 1, and that Jennings "scored his suicide risk as low with a note to follow up with the mental health provider."[28] Plaintiffs allege that he was kept on suicide watch for nearly

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 9–10.

[26] *Id.* at 10.

[27] *Id.*

[28] *Id.*

a week and, although he was seen by nurses, he did not see Jennings or Dr. Lo, nor did he receive counseling or other therapy.[29]

Plaintiffs aver that Jennings discharged Evans on September 6, 2017, stating that Evans told him he was "good," had no intention of harming himself, and had hope for his future.[30] Plaintiffs assert that throughout the rest of September, Evans was in "acute and increasing psychological distress" which Plaintiffs allege other JPCC detainees began to notice.[31] Plaintiffs allege that Evans saw Dr. Lo again on September 14, 2017, during which Dr. Lo increased Evans' medication.[32]

Plaintiffs aver that on the night before he died, Evans expressed his intent to kill himself to other detainees.[33] Furthermore, Plaintiffs allege that he was "very quiet and withdrawn" on the day he died and that other detainees were concerned about his change in behavior.[34] Plaintiffs aver that shortly after roll call on September 27, 2017, Evans blocked the view into his cell with a blanket, in violation of JPSO policy.[35] Nevertheless, Plaintiffs allege that Mayeaux, the guard on duty, did nothing to remove the blanket.[36] Plaintiffs aver that other detainees began to become concerned

---

[29] *Id.*

[30] *Id.* at 11.

[31] *Id.*

[32] *Id.* at 12.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

about Evans, and tried to alert Mayeaux, who was unresponsive.[37] When detainee Furnell Daniel was permitted to leave his cell, approximately an hour after roll call, he learned of the concerns for Evans' safety and went to check on him.[38] Plaintiffs aver that he looked behind the blanket and saw Evans with the sheet around his neck and his head slumped to one side.[39] Plaintiffs allege that he immediately began shouting and motioning to Mayeaux.[40] Thus, Plaintiffs aver that Mayeaux was alerted to Evans' condition no later than between 4:18 and 4:20 PM.[41] Plaintiffs allege that Mayeaux delayed for "at least five to six minutes" before calling for assistance.[42]

**B.    *Procedural Background***

On September 26, 2018, Plaintiffs filed a Complaint in this Court.[43] On December 7, 2018, Plaintiffs filed the First Amended Complaint, which was identical to the original Complaint.[44] On January 24, 2019, Defendant Jefferson Parish filed a Motion to Dismiss and a request for oral argument on the motion.[45] The Court heard oral argument on the Motion to Dismiss on February 27, 2019,[46] and then denied the motion without prejudice and gave Plaintiffs thirty days to amend

---

[37] *Id.* at 13.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Rec. Doc. 1.

[44] Rec. Doc. 6.

[45] Rec. Docs. 16, 17.

[46] Rec. Doc. 22.

the Complaint.[47] On March 27, 2019, Plaintiffs filed a Second Amended Complaint, changing

Plaintiffs' allegations against Jefferson Parish, but maintaining the same allegations against the

other defendants.[48] Thus, the claims involved in this case are outlined below:

- Count 1: Section 1983 claim "Based on Establishment of a System in which Prisoners are Denied Appropriate Protection from Harm" against Defendants Lopinto and JP.[49]

- Count 2: Section 1983 claim "Based on Failure to Supervise other Defendants to Ensure Patients Received Appropriate Care and Supervision to Protect Patients from Harm" against Defendants Lopinto, Monfra, and CHJ. [50]

- Count 3: Section 1983 claim "Based on Deliberate Indifference to Mr. Evans' Constitutional Right to Protection from Harm" against Defendants Lopinto, Monfra, Mayeaux, Lo, Jennings, CHJ, and JP.[51]

- Count 4: Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act "by discriminating against and failing to accommodate a disability" against Lopinto and JP.[52]

- Count 6:[53] *Monell* claim under § 1983 "based on establishment of policies, patterns, or practices pursuant to which inmates with serious mental health conditions are denied access to appropriate medical care and prevention from harm" against Defendants Lopinto, Monfra, and CHJ.[54]

- Count 7: Medical Malpractice claim against Defendants CHJ, Lo, and Jennings.[55]

---

[47] Rec. Doc. 25.

[48] Rec. Doc. 38.

[49] *Id.* at 26–27.

[50] *Id.* at 28–29.

[51] *Id.* at 29–30.

[52] *Id.* at 30–32.

[53] Plaintiffs' Second Amended Complaint mistakenly skips count 5.

[54] Rec. Doc. 38. at 32–33.

[55] *Id.* at 33.

- Count 8: Negligence and/or Intentional Tort claim against all Defendants.[56]

On March 6, 2019, CHJ Defendants filed a Motion to Dismiss.[57] The Court denied the motion without prejudice and stayed the case pending the completion of a medical review panel.[58] On July 27, 2021, the Court lifted the stay.[59]

On May 3, 2022, CHJ Defendants filed the instant Motion for Summary Judgment.[60] On May 10, 2022, Plaintiffs opposed the motion.[61] On May 17, 2022, with leave of Court, CHJ Defendants filed a reply.[62]

## II. Parties' Arguments

### A.   CHJ Defendants' Arguments in Support of the Motion for Summary Judgment

CHJ Defendants contend that Plaintiffs' medical malpractice claims should be dismissed.[63] CHJ Defendants argue that to establish a medial malpractice claim under Louisiana law, a plaintiff must prove (1) the applicable standard of care; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury.[64]

---

[56] *Id.* at 34.

[57] Rec. Doc. 27.

[58] Rec. Doc. 54.

[59] Rec. Doc. 57.

[60] Rec. Doc. 112.

[61] Rec. Doc. 128.

[62] Rec. Docs. 137, 160.

[63] Rec. Doc. 112-1 at 3.

[64] *Id.*

Plaintiffs further contend that in most cases, expert testimony is required in order for a plaintiff to prevail.[65]

CHJ Defendants argue that Plaintiffs cannot establish a medical malpractice claim for two reasons. First, CHJ Defendants argue that the Medical Review Panel determined that there was "no medical negligence and/or breach in the standard of care on the part of [CHJ] Defendants."[66] Second, CHJ Defendants argue that Plaintiffs have no expert testimony on the issue of medical causation.[67] CHJ Defendants contend that neither of Plaintiffs' experts address the issue of medical causation.[68] As to Dr. Metzner, CHJ Defendants argue that he "does not issue any opinion on [CHJ Defendants'] treatment of [Evans], whether [CHJ Defendants' treatment] met the standard of care, or the causation of [Evans'] suicide."[69] As to Dr. Elliott, CHJ Defendants argue that his opinions are "conclusory" and "speculative" such that they are insufficient to establish the causation element.[70] Therefore, because Plaintiffs do not have expert testimony on medical causation, CHJ Defendants argue that they are entitled to summary judgment on Plaintiffs' medical malpractice claim.

CHJ Defendants further argue that they are entitled to summary judgment on Plaintiffs' negligence and intentional conduct claims in Count 8.[71] First, CHJ Defendants argue that a claim

---

[65] *Id.* at 3–4.

[66] *Id.* at 4.

[67] *Id.*

[68] *Id.* at 5.

[69] *Id.*

[70] *Id.*

[71] *Id.* at 6.

of negligence regarding medical care is properly considered a claim of medical malpractice, and therefore Plaintiffs cannot assert a claim of negligence independent of their medical malpractice claims.[72] Second, CHJ Defendants contend that "there is no evidence in the record supporting Plaintiffs' position that [CHJ Defendants] acted intentionally or maliciously in treating [Evans].[73] Rather, CHJ Defendants assert that the Medical Review Panel opinion "shows that in all instances during his incarceration, [Evans'] concerns were heard, assessed, and rapidly addressed in an appropriate manner."[74] Therefore, CHJ Defendants argue that they are entitled to summary judgment on these claims.

**B.    *Plaintiffs' Arguments in Opposition to the Motion for Summary Judgment***

In opposition, Plaintiffs contend that Dr. Elliott's testimony is sufficient to establish medical causation.[75] Plaintiffs contend that they need only prove that CHJ Defendants' negligence caused a "loss of a chance of survival" "in any degree."[76] Plaintiffs argue that Dr. Elliott's opinions are sufficient to meet this standard. Plaintiffs highlight that CHJ Defendants' conduct increased the risk that Evans would kill himself after discharge from suicide.[77] Specifically, Plaintiffs point out Dr. Elliott's opinion that Jennings and Dr. Lo could have taken various steps that would have "alleviated the symptoms of depression and lessened the risk of suicide."[78] Furthermore, Plaintiffs

---

[72] *Id.*

[73] *Id.*

[74] *Id.* at 6–7.

[75] Rec. Doc. 128 at 8.

[76] *Id.*

[77] *Id.* at 10.

[78] *Id.*

highlight Dr. Elliott's opinion that CHJ Defendants' conduct "reduced Evans' chance to survive his suicidality."[79] Plaintiffs assert that Dr. Elliott's opinions are "grounded in the medical record, facility records, and testimony given in this case."[80]

As to negligence, Plaintiffs "concede that their state law negligence claims against Dr. Lo and Mr. Jennings sound in malpractice and are thus subsumed" by their medical malpractice claim.[81] However, Plaintiffs contend that their claim that CHJ inadequately staffed JPCC is "a claim for general negligence not subsumed by the Louisiana Medical Malpractice Act."[82]

## C.   CHJ Defendants' Arguments in Further Support of the Motion

In reply, CHJ Defendants argue that Plaintiffs have relied on Dr. Elliott's "untimely Supplemental Expert Report that was produced on May 5, 2022–long after Plaintiffs' Expert Report Deadline of March 24, 2022 and two days after the deadline to file Motions for Summary Judgments and a Daubert Motion challenging Dr. Elliott's opinions."[83] Thus, CHJ Defendants contend that the opinions in the supplemental report should be discarded, and the Court should grant summary judgment on Plaintiffs' medical malpractice claims.[84]

CHJ Defendants reiterate that Plaintiffs cannot establish that Evans' suicide was caused by substandard care.[85] CHJ Defendants note again that Dr. Metzner "does not issue any opinion on

---

[79] *Id.* at 13.

[80] *Id.*

[81] *Id.*

[82] *Id.* at 13.

[83] Rec. Doc. 160 at 1–2.

[84] *Id.*

[85] *Id.* at 2.

[CHJ Defendants'] treatment of [Evans] or whether it met the standard of care."[86] CHJ Defendants further argue that Dr. Elliott's opinions are based on a disagreement with the medical care provided.[87] CHJ Defendants contend that Dr. Elliott's "only opinion regarding the standard of care" is that Dr. Lo's "three month follow up schedule was inappropriate," and argues that Dr. Elliott did not state that this caused Evans' suicide.[88]

As to CHJ's negligence, CHJ Defendants contend that Plaintiffs' claim fails because Plaintiffs do not have expert testimony regarding the inadequacy of JPCC's staffing.[89] CHJ Defendants argue that Plaintiffs' claim that JPCC was inadequately staffed is "solely speculation,"[90] and therefore Plaintiffs' claim should be dismissed.

Lastly, CHJ Defendants argue that Plaintiffs did not respond to CHJ Defendants' contention that Plaintiffs' claim for intentional conduct should be dismissed.[91] CHJ Defendants contend that, because Plaintiffs made no argument in opposition, the claim should be dismissed.[92]

### III. Legal Standards

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[86] *Id*. at 3.

[87] *Id.*

[88] *Id.* at 3.

[89] *Id.*

[90] *Id.* at 4.

[91] *Id.*

[92] *Id.*

a matter of law."[93] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[94] All reasonable inferences are drawn in favor of the nonmoving party.[95] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[96] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[97] The nonmoving party may not rest upon the pleadings.[98] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[99]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[100] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense,

---

[93] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[94] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[95] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 150).

[96] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[97] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cites Serv. Co.,* 391 U.S. 253, 289 (1968)).

[98] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[99] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[100] *Celotex*, 477 U.S. at 323.

or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[101] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[102] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[103]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[104] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[105]

## IV. Analysis

CHJ Defendants move for summary judgment on Plaintiffs' medical malpractice, negligence, and intentional conduct claims.[106] Each claim is addressed in turn.

### A.   *Medical Malpractice*

To prevail on a medical malpractice action under Louisiana law, a plaintiff must prove (1)

---

[101] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[102] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[103] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[104] *Little*, 37 F.3d at 1075 (internal citations and quotation marks omitted).

[105] *Morris*, 144 F.3d at 380.

[106] Rec. Doc. 112.

the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury."[107] "Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony."[108]

CHJ Defendants primarily argue that Plaintiffs do not offer any expert testimony that there was a causal connection between a breach of the standard of care and the resulting injury.[109] In opposition, Plaintiffs highlight several of Dr. Elliott's opinions that bear on causation. For example, Plaintiffs note Dr. Elliott's opinion that had Evans received "counseling, appropriate medication, and placement in a cell with proper supervision and monitoring," this "would have alleviated the symptoms of depression and lessened the risk of suicide. All of these actions would have reduced the risk of self-harm."[110] Dr. Elliott further stated that CHJ Defendants could have "reduced the risk of suicide" by taking a number of additional measures.[111] In addition, he stated that had Evans received "adequate care, including treatment with an antidepressant, [Evans'] emotional state could have been changed and Evans could have made a different decision about ending his life."[112] In sum, Dr. Elliott explained that CHJ Defendants' conduct "reduced Evans'

---

[107] *Samaha v. Rau*, No. 07-1726 (La. 2/26/08); 977 So. 2d 880, 883–84 (2008).

[108] *Id.* at 884.

[109] Rec. Doc. 112-1 at 4.

[110] Rec. Doc. 126-2 at 14.

[111] *Id.* at 16.

[112] Rec. Doc. 128-2 at 4.

chance to survive his suicidality."[113]

CHJ Defendants respond that Plaintiffs' opposition "improperly rel[ies] on Dr. Elliott's untimely Supplemental Expert Report that was produced on May 5, 2022–long after Plaintiffs' Expert Report Deadline of March 24, 2022, and two days after the deadline to file Motions for Summary Judgment[] and a Daubert Motion challenging Dr. Elliott's opinions."[114] CHJ Defendants contend that the Court should not consider this report because it was untimely.[115]

To begin, the Court notes that not all of these opinions are from Dr. Elliott's supplemental report. In the original report that was disclosed by the March 24, 2022 deadline, Dr. Elliott explained that had Evans' received "counseling, appropriate medication, and placement in a cell with proper supervision and monitoring," this "would have alleviated the symptoms of depression and lessened the risk of suicide. All of these actions would have reduced the risk of self-harm."[116] Dr. Elliott further stated that CHJ Defendants could have "reduced the risk of suicide" by taking a number of additional measures.[117] In any event, the Court may consider the additional statements Dr. Elliott provided in the supplemental report because those statements are not new opinions, but rather expand on the opinions set forth in the expert report.[118]

Lastly, CHJ Defendants contend that Plaintiffs have no expert testimony that CHJ Defendants' treatment of Evans fell below the standard of care because: (1) Dr. Metzner does not

---

[113] *Id.* at 6.

[114] Rec. Doc. 160 at 1–2.

[115] *Id.*

[116] Rec. Doc. 126-2 at 14.

[117] *Id.* at 16.

[118] *See Rodgers v. Gusman*, No. 16-16303, 2019 WL 3220107 at *6 (E.D La. July 17, 2019) (Brown, C.J.).

address the issue and (2) Dr. Elliott's opinion is based on his disagreement with the medication and the dosage that Dr. Lo prescribed for Evans. Although Dr. Metzner's expert report is focused on JPCC's accreditation by the National Commission on Correctional Healthcare,[119] and thus does not concern whether CHJ Defendants breached the standard of care, Dr. Elliott's report does.

Dr. Elliott's report states at numerous points that Jennings and Dr. Lo's conduct was below the standard of care. For example, Dr. Elliott's report states that Dr. Lo's three-month follow up schedule for Evans following Evans' placement on Risperdol "did not meet the standard of care."[120] He further stated that Dr. Lo's evaluations of Evans were "inadequate in number" and "inadequate in quality," and thus "did not meet the standard of care."[121] Furthermore, he stated that Jennings' conduct "fell below the standard of care by failing to follow the recommendations made by himself for increased frequency of clinical contact, and failure to follow policy regarding daily monitoring of Evans while he was in the acute care infirmary for suicide watch."[122] Thus, Dr. Elliott summarized that "[b]ased on the materials available to me, it is my opinion to a reasonable degree of medical certainty, that neither the care provided by Dr. Lo nor the care provided by Mr. Jennings met the standard of care required while Mr. Evans was in the custody of the Jefferson Parish Sheriff's Office."[123] Therefore, Plaintiffs have provided sufficient evidence upon which a reasonable jury could find that Jennings' and Dr. Lo's conduct fell below the

---

[119] Rec. Doc. 112-10. The Court also notes that Dr. Metzner's report is subject to a motion in limine. However, the Court is not relying on Dr. Metzner's report in ruling on the instant motion.

[120] Rec. Doc. 126-2 at 8.

[121] *Id.* at 12.

[122] *Id.* at 14.

[123] *Id.* at 4.

standard of care.[124]

The Court acknowledges that the Medical Review Panel opinion concluded that CHJ Defendants' treatment of Evans did not fall below the standard of care.[125] However, as the Court explained in its May 31, 2022 Order and Reasons denying CHJ Defendants' first motion for summary judgment, "the Medical Review Panel's determination is not conclusive proof . . . as to whether there was medical malpractice."[126] The Court explained as follows:

> The Louisiana Supreme Court has explained that although the panel's opinion is "admissible as evidence in any action subsequently brought" in court, the opinion "shall not be conclusive." Rather, "as with any expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing viewpoint," and "the jury as trier of fact, is free to accept or reject any portion or all of the opinion. In addition, Louisiana law permits a party to challenge the board's opinion if its decision was based on its resolution of disputed material facts. Although the panel's opinion may be strong evidence against Plaintiffs' claims to the jury, at the summary judgment stage the Court must "refrain[] from making credibility determinations or weighing the evidence."

As explained in detail above, Plaintiffs have provided contrary evidence in the form of Dr. Elliott's opinions. Accordingly, there are material facts in dispute and CHJ Defendants are not entitled to summary judgment on Plaintiffs' medical malpractice claims.

## B.   *Negligence*

In actions for negligence, Louisiana law requires the plaintiff to show the following five elements:

---

[124] The Court acknowledges that at Dr. Elliott's deposition, he contradicted the statement in his report that Dr. Lo's prescription and dosage of Risperdol violated the standard of care. However, as described above, Dr. Elliott offered opinions of other conduct that fell below the standard of care. In any event, Dr. Elliott's contradictory statement regarding Dr. Lo's prescription of Risperdol goes to Dr. Elliott's credibility, and thus is not for the Court to resolve on a motion for summary judgment.

[125] Rec. Doc. 112-3.

[126] Rec. Doc. 151.

(1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element);

(2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element);

(3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);

(4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and

(5) proof of actual damages (the damages element).[127]

In opposition to the instant motion, Plaintiffs "concede that their state law negligence claims against Dr. Lo and Mr. Jennings sound in malpractice and are thus subsumed" by Plaintiffs' medical malpractice claims.[128] Accordingly, the Court grants CHJ Defendants' motion to the extent it seeks summary judgment on Plaintiffs' negligence claims against Jennings and Dr. Lo.

Plaintiffs nonetheless contend that CHJ is liable for state law negligence for failure to adequately staff JPCC. The Court agrees that the claim against CHJ is not subsumed by the medical malpractice claim. The Louisiana Supreme Court has explained that the Louisiana Medical Malpractice Act applies "only to claims 'arising from medical malpractice,' and that all other tort liability on the part of the qualified health care provider is governed by general tort law."[129] CHJ Defendants do not argue otherwise. Rather, CHJ Defendants argue that Plaintiffs' "do not have any evidence to support their position that JPCC was inadequately staffed."[130] CHJ Defendants

---

[127] *Long v. State ex rel. Dep't of Transp. & Dev.*, No. 04-485 (La. 6/29/05); 916 So. 2d 87, 101.

[128] Rec. Doc. 128 at 13.

[129] *LaCoste v. Pendleton Methodist Hosp., LLC.*, No. 07-0008 (La. 9/5/07); 966 So. 2d 519, 524.

[130] Rec. Doc. 160 at 3.

contend Plaintiffs rely "solely on speculation."[131]

The Court disagrees. First, there is substantial evidence from which a reasonable jury could conclude that CHJ understaffed JPCC. As explained in the Court's May 31, 2022 order, there is evidence in the record that Jennings and Dr. Lo were the only mental health providers at JPCC, and as a result, while Evans was on suicide watch the second time, he "wouldn't have been seen by a mental health professional person during that period" because "[i]t was a long weekend."[132] Furthermore, there is evidence in the record of a CHJ policy stating that "Level 1" patient designation—which Evans received[133]—"requires that the medical provider evaluate that patient every day when on site."[134] The reasonable inference to draw from this evidence, which the Court must draw in Plaintiffs' favor, is that JPCC was not sufficiently staffed to abide by this policy.

In addition, there is evidence in the record that on the day Jennings discharged Evans from suicide watch, Jennings was in the infirmary from 9:15 AM and 9:33 AM to speak with six detainees.[135] The CHJ infirmary log book states that during this time, "Social Worker David Jennings speaks with Suicide Inmates backed by Deputy T. Wilkerson."[136] It further states that at 9:33 AM, Jennings took three of the detainees off suicide watch, including Evans.[137] Additionally, there is evidence in the record that Dr. Lo was only present for about an hour per week. Plaintiff's

---

[131] *Id.* at 4.

[132] Rec. Doc. 126-8 at 198.

[133] *Id.* at 190.

[134] Rec. Doc. 126-10 at 8.

[135] Rec. Doc. 127-22 at 14–15.

[136] *Id.* at 14.

[137] *Id.* at 15.

expert elaborated on the staffing at JPCC as follows:

> Unfortunately it would have been difficult for Lo to see Evans or anyone else more frequently in 2017 because of his schedule. There were approximately 1000 inmates at JPCC and, based on the literature concerning the prevalence of seriously ill inmates incarcerated in jails, one would have expected approximately 150 inmates to have been experiencing symptoms of a serious mental illness. . . . Lo's nurse testified during deposition that Lo was often present for only an hour a week, and Lo's time records for September 2017 show he was present an average of 1.44 hours (86.4 minutes) a week. With a schedule of perhaps 12 patients on a particular day, 1.44 hours would have permitted less than 10 minutes per inmate. Thus there was very little time available to conduct a thorough evaluation or follow-up with a seriously ill inmate.[138]

Though the Court acknowledges that CHJ Defendants, in a different motion for summary judgment, dispute the amount of time Dr. Lo spent with Evans, this merely creates a dispute of material fact that the Court cannot resolve on a motion for summary judgment. Accordingly, there are material facts in dispute precluding summary judgment on the negligence claim against CHJ.

## C.   *Intentional Conduct*

Lastly, CHJ Defendants moved for summary judgment on Plaintiffs' claim in Count 8 for "Intentional Conduct Resulting in Injury," arguing that there is no evidence that CHJ Defendants "acted intentionally or maliciously" in treating Evans.[139] Plaintiffs' do not respond to CHJ Defendants' argument as to this claim, and thus appear to concede that the claim should be dismissed. Because it is the nonmoving party's burden to "identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial,"[140] and

---

[138] Rec. Doc. 112-11.

[139] Rec. Doc. 112-1 at 3.

[140] *Celotex Corp.*, 477 U.S. at 325; *Ragas*, 136 F.3d at 458.

Plaintiffs have not made any attempt to do so as to this claim, the CHJ Defendants are entitled to summary judgment on this claim.

## V. Conclusion

Based on the foregoing, the Court grants the motion in part and denies the motion in part. The Court grants the motion as to Plaintiffs' negligence claim against David Jennings and Dr. William Lo because Plaintiffs conceded that the negligence claims as to Jennings and Dr. Lo is subsumed by the medical malpractice claim. The Court also grants the motion as to Plaintiffs' claims based on intentional conduct because Plaintiffs have failed to identify any evidence that CHJ Defendants acted intentionally. The Court denies the motion in all other respects because there are disputes of fact regarding Plaintiffs' claim for medical malpractice and Plaintiffs' negligence claim against CHJ. Accordingly,

**IT IS HEREBY ORDERED** that CHJ Defendants' "Motion for Summary Judgment On Plaintiffs' State Law Claims"[141] is **GRANTED IN PART** and **DENIED IN PART.** The motion is **GRANTED** to the extent it seeks dismissal of Plaintiffs' negligence claim against David Jennings and Dr. William Lo and Plaintiffs' claim for intentional conduct against CHJ Defendants. The motion is **DENIED** in all other respects.

**NEW ORLEANS, LOUISIANA,** this 24th day of June, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[141] Rec. Doc. 112.