## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CLINTON EVANS et al.**                                    **CIVIL ACTION**

**VERSUS**                                                         **NO. 18-8972**

**JOSEPH LOPINTO et al.**                              **SECTION: "G"(1)**


## <u>ORDER AND REASONS</u>

In this litigation, Plaintiffs Clinton Evans and Jeresa Morgan (collectively, "Plaintiffs") bring claims individually and on behalf of their deceased son, Jatory Evans ("Evans"), against Defendants CorrectHealth Jefferson ("CHJ"), Jefferson Parish ("JP"), Sheriff Joseph Lopinto ("Lopinto"), Corrections Administrator and Deputy Chief Sue Ellen Monfra ("Monfra"), Deputy Christopher Mayeaux ("Mayeaux"), Dr. William Lo ("Dr. Lo"), David Jennings ("Jennings"), and Ironshore Specialty Insurance Co. ("Ironshore"), (collectively, "Defendants").[1] Plaintiffs allege that Defendants failed to properly monitor Evans while he was incarcerated in Jefferson Parish Correctional Facility ("JPCC") and that their acts or omissions lead to Evans' death by suicide.[2] Pending before the Court is Defendant Jefferson Parish's "Motion for Summary Judgment."[3] Considering the motion, the memoranda in support and in opposition, the record and the applicable law, the Court grants the motion in part and denies it in part.

---

[1] Rec. Doc. 6 at 2–5.

[2] *Id.* at 1.

[3] Rec. Doc. 108.

# I. Background

*A.      Factual Background*

The Amended Complaint alleges that Evans was a pre-trial detainee in the custody and care of the Jefferson Parish Sheriff's Office at JPCC when he died by hanging in his cell on September 27, 2017.[4] Plaintiffs allege that Evans had an extensive history of PTSD for which he had previously been treated with medication.[5] Plaintiffs aver that Evans reported numerous incidents of mental distress while at JPCC.[6] For example, Plaintiffs assert that Evans was seen by Social Worker David Jennings after reporting that he felt like he was going crazy, could not sleep, and described other PTSD symptoms, and Jennings referred him to a psychiatrist to be evaluated for psychosis.[7] In December 2016, Plaintiffs allege Evans reported that he was having headaches and experiencing feelings of "jitteriness and shaking."[8] In February 2017, Plaintiffs aver that Evans was seen by Jennings after reporting that he was having flashbacks of his deployment to Afghanistan.[9] Plaintiffs assert that Jennings "simply noted that [Evans] was in no acute distress."[10] The following day, Plaintiffs allege that Evans again reported that he was "having visions from [his] Afghanistan events (deployment) and other events," and that he had "painful knots in his

---

[4] Rec. Doc. 38.

[5] *Id.* at 5.

[6] *Id.* at 6.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

arms and legs."[11] Plaintiffs aver that he also reported not being able to sleep.[12] Plaintiffs allege that Evans was not seen by Jennings or Dr. Lo in response to these reports.[13]

Plaintiffs allege that on March 25, 2017, Evans was placed on suicide watch after wrapping a towel around his neck.[14] Plaintiffs aver that the reason for his placement on suicide watch was listed as "severe depression."[15] Plaintiffs contend that Evans was never seen by Dr. Lo or any other psychiatrist while on suicide watch.[16] Rather, Plaintiffs aver that two days after being put on suicide watch, Evans was seen by Jennings, who then discharged Evans.[17] Plaintiffs allege that his discharge did not include any kind of "step-down process," and that Evans did not receive a follow up visit which he was supposed to have a week after discharge.[18]

Plaintiffs aver that on May 10, 2017, Evans reported "multiple nightmares, anxiety issues, depression with [his] thoughts, [and] thinking about [his] own death."[19] Nevertheless, Plaintiffs allege that Evans was not seen by Jennings until May 17.[20] Plaintiffs aver that during this visit, Evans noted that his mother and sister were "the reasons that he did not act on his thoughts of

---

[11] *Id.* at 7.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 8.

[17] *Id.*

[18] *Id.* at 8–9.

[19] *Id.*

[20] *Id.* at 9.

suicide."[21] Nevertheless, Plaintiffs assert that Jennings reported that Evans was in no acute distress.[22]

Plaintiffs allege that on May 28, 2017, Evans requested a mental health referral.[23] Plaintiffs aver that Evans saw Dr. Lo and reported that he was having nightmares and flashbacks.[24] Plaintiffs assert that Dr. Lo noted "an impression of a mood disorder . . . and an anxiety disorder," and prescribed Risperidone.[25] Nevertheless, Plaintiffs allege that Evans "continued to experience significant periods of despondence and expressed to others that a desire to commit suicide was always in the back of his mind."[26] Additionally, Plaintiffs aver that Evans was placed on suicide watch for a second time on September 1, after a member of the defense team reached out to a JPSO deputy expressing concerns that Evans might harm himself.[27] Plaintiffs allege that Evans was seen by Jennings on September 1, and that Jennings "scored his suicide risk as low with a note to follow up with the mental health provider."[28] Plaintiffs allege that he was kept on suicide watch for nearly

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 9–10.

[26] *Id.* at 10.

[27] *Id.*

[28] *Id.*

a week and, although he was seen by nurses, he did not see Jennings or Dr. Lo, nor did he receive counseling or other therapy.[29]

Plaintiffs aver that Jennings discharged Evans on September 6, 2017, stating that Evans told him he was "good," had no intention of harming himself, and had hope for his future.[30] Plaintiffs assert that throughout the rest of September, Evans was in "acute and increasing psychological distress" which Plaintiffs allege other JPCC detainees began to notice.[31] Plaintiffs allege that Evans saw Dr. Lo again on September 14, 2017, during which Dr. Lo increased Evans' medication.[32]

Plaintiffs aver that on the night before he died, Evans expressed his intent to kill himself to other detainees.[33] Furthermore, Plaintiffs allege that he was "very quiet and withdrawn" on the day he died and that other detainees were concerned about his change in behavior.[34] Plaintiffs aver that shortly after roll call on September 27, 2017, Evans blocked the view into his cell with a blanket, in violation of JPSO policy.[35] Nevertheless, Plaintiffs allege that Mayeaux, the guard on duty, did nothing to remove the blanket.[36] Plaintiffs aver that other detainees began to become concerned

---

[29] *Id.*

[30] *Id.* at 11.

[31] *Id.*

[32] *Id.* at 12.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

about Evans, and tried to alert Mayeaux, who was unresponsive.[37] When detainee Furnell Daniel was permitted to leave his cell, approximately an hour after roll call, he learned of the concerns for Evans' safety and went to check on him.[38] Plaintiffs aver that he looked behind the blanket and saw Evans with the sheet around his neck and his head slumped to one side.[39] Plaintiffs allege that he immediately began shouting and motioning to Mayeaux.[40] Thus, Plaintiffs aver that Mayeaux was alerted to Evans' condition no later than between 4:18 and 4:20 PM.[41] Plaintiffs allege that Mayeaux delayed for "at least five to six minutes" before calling for assistance.[42]

**B.    *Procedural Background***

On September 26, 2018, Plaintiffs filed a Complaint in this Court.[43] On December 7, 2018, Plaintiffs filed the First Amended Complaint, which was identical to the original Complaint.[44] On January 24, 2019, Defendant Jefferson Parish filed a Motion to Dismiss and a request for oral argument on the motion.[45] The Court heard oral argument on the Motion to Dismiss on February 27, 2019,[46] and then denied the motion without prejudice and gave Plaintiffs thirty days to amend

---

[37] *Id.* at 13.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Rec. Doc. 1.

[44] Rec. Doc. 6.

[45] Rec. Docs. 16, 17.

[46] Rec. Doc. 22.

the Complaint.[47] On March 27, 2019, Plaintiffs filed a Second Amended Complaint, changing

Plaintiffs' allegations against Jefferson Parish, but maintaining the same allegations against the

other defendants.[48] Thus, the claims involved in this case are outlined below:

- Count 1: Section 1983 claim "Based on Establishment of a System in which Prisoners are Denied Appropriate Protection from Harm" against Defendants Lopinto and JP.[49]

- Count 2: Section 1983 claim "Based on Failure to Supervise other Defendants to Ensure Patients Received Appropriate Care and Supervision to Protect Patients from Harm" against Defendants Lopinto, Monfra, and CHJ. [50]

- Count 3: Section 1983 claim "Based on Deliberate Indifference to Mr. Evans' Constitutional Right to Protection from Harm" against Defendants Lopinto, Monfra, Mayeaux, Lo, Jennings, CHJ, and JP.[51]

- Count 4: Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act "by discriminating against and failing to accommodate a disability" against Lopinto and JP.[52]

- Count 6:[53] *Monell* claim under § 1983 "based on establishment of policies, patterns, or practices pursuant to which inmates with serious mental health conditions are denied access to appropriate medical care and prevention from harm" against Defendants Lopinto, Monfra, and CHJ.[54]

- Count 7: Medical Malpractice claim against Defendants CHJ, Lo, and Jennings.[55]

---

[47] Rec. Doc. 25.

[48] Rec. Doc. 38.

[49] Rec. Doc. 38 at 26–27.

[50] *Id.* at 28–29.

[51] *Id.* at 29–30.

[52] *Id.* at 30–32.

[53] Plaintiffs' Second Amended Complaint mistakenly skips count 5.

[54] Rec. Doc. 38. at 32–33.

[55] *Id.* at 33.

- Count 8: Negligence and/or Intentional Tort claim against all Defendants.[56]

On March 6, 2019, CHJ Defendants filed a Motion to Dismiss.[57] The Court denied the motion without prejudice and stayed the case pending the completion of a medical review panel.[58] On July 27, 2021, the Court lifted the stay.[59]

On May 3, 2022, Defendant Jefferson Parish filed the instant Motion for Summary Judgment.[60] On May 10, 2022, Plaintiffs filed an opposition to the motion.[61] On June 6, 2022, JP filed a reply.[62]

## II. Parties' Arguments

### A.     *Jefferson Parish's Arguments in Support of the Motion for Summary Judgment*

JP first argues that it is entitled to summary judgment because it is not responsible for the actions of the Jefferson Parish Sheriff's Office under Louisiana law.[63] JP contends that the Jefferson Parish Charter provides that JP "shall not be responsible for, not have authority to administer or supervise, the offices of Sheriff."[64] JP further contends that Louisiana courts have long recognized that JP and the Jefferson Parish Sheriff are independent entities, and that the parish

---

[56] *Id.* at 34.

[57] Rec. Doc. 27.

[58] Rec. Doc. 54.

[59] Rec. Doc. 57.

[60] Rec. Doc. 108.

[61] Rec. Doc. 127.

[62] Rec. Doc. 158.

[63] Rec. Doc. 108-3 at 11–12.

[64] *Id.*

8

is not liable for the actions of the Sheriff or his or her officers.[65] JP argues that although it owns the "brick and mortar of the building" and "has a duty to ensure a healthcare contract is in place, pay utility bills, and maintain the brick and mortar structure," JP is not responsible for implementing or overseeing the policies of the Sheriff or JPCC.[66] Accordingly, JP contends that it cannot be considered a "policymaker" at JPCC as required to establish a claim for municipal liability under Section 1983, and therefore is entitled to summary judgment on Plaintiffs' claims.[67]

JP similarly argues that it is entitled to summary judgment because it is not responsible for CHJ's actions and has no role in creating, implementing, or overseeing CHJ's policies and procedures at JPCC.[68] JP contends that because its role was limited to contracting with CHJ to provide medical services at JPCC and maintaining the physical building, JP had "no notice of deficiencies in the services CHJ was providing at JPCC.[69]

Lastly, JP argues that Plaintiffs must show that JP acted with deliberate indifference "through some official action or policy."[70] JP contends that "[m]ere awareness by the Sheriffs or JP employees of risks posed to inmates at JPCC, even if shown, does not suffice."[71] According to JP, because Plaintiffs cannot show that JP was aware of any unreasonable risk of harm at JPCC

---

[65] *Id.*

[66] *Id.* at 15.

[67] *Id.* at 16.

[68] *Id.*

[69] *Id.* at 17.

[70] *Id*. at 20.

[71] *Id.*

before Evans' suicide and cannot show that any official policy created indifference to such a risk, JP is entitled to summary judgment.[72]

**B.**    ***Plaintiffs' Arguments in Opposition to the Motion for Summary Judgment***

In opposition, Plaintiffs highlight that they asserted the following three claims against JP:

• Count 1: "Establishment of System in Which Prisoners are Denied Appropriate Protection form (sic) Harm" arising from Jefferson Parish's contract with CorrectHealth Jefferson.

• Count 4: "Violation of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act" for failing to accommodate Evans' disability by failing to remediate the physical structure of the Jefferson Parish Correctional Center (JPCC).

• Count 8: Negligent and / or Intentional Conduct Resulting in Injury.[73]

Plaintiffs highlight that although JP purports to move for summary judgment on all claims, JP's motion does not address the claims asserted in Count 4 or 8. Because on summary judgment it is Defendant's burden to identify the basis for its motion, Plaintiffs argue that summary judgment should be denied as to these claims.[74]

Furthermore, Plaintiffs argue that JP can be held liable under Section 1983 for breaching the duties under state law to maintain the jail and to contract with a healthcare provider to provide services to detainees.[75] Plaintiffs argue that to hold a municipality liable under Section 1983, Plaintiffs need only show that JP "knew or should have known that a particular policy or practice would present a risk of violation" of detainees rights.[76] Thus, Plaintiffs contend that JP can be held

---

[72] *Id.* at 21.

[73] Rec. Doc. 127 at 2.

[74] *Id.* at 23–24.

[75] *Id.* at 4.

[76] *Id.* at 5.

liable if they had constructive knowledge of a policy or condition that posed a substantial risk of harm to detainees.[77]

Plaintiffs contend that JP had actual and constructive notice that the expanded metal grates from which Evans hung himself posed a risk of harm, and JP failed to mitigate that risk.[78] Plaintiffs emphasize that the condition and maintenance of the window grates are the responsibility of JP, and highlights deposition testimony regarding JP's role in maintaining the physical condition of the jail.[79] Plaintiffs further argue that JP had constructive knowledge of the risk posed by the metal grates because the risk was obvious "as early as [Jerome] Bell's death on August 4, 2017, but certainly no later than after [Joshua] Belcher's death on August 17, 2017."[80] Plaintiffs further highlight deposition testimony of Joseph Denny, a JP employee who was the "liaison between JPCC and Jefferson Parish," who testified that he would learn of deaths at JPCC the day of or shortly after by getting a phone call from CHJ.[81] Plaintiffs further highlight deposition testimony of Skye Noble, the Health Services Administrator at JPCC, who testified that it was her regular practice to inform Denny of any deaths at the facility by telephone.[82] Plaintiffs also highlight testimony recalling conversations with then-Sheriff Normand about the danger posed by the

---

[77] *Id.*

[78] *Id.* at 6.

[79] *Id.* at 6–7.

[80] *Id.* at 8.

[81] *Id.*

[82] *Id.* at 9.

window grates.[83] Thus, Plaintiffs contend there is a dispute of fact as to JP's notice of the risk of the window grates.[84]

Plaintiffs argue that JP's failure to mitigate the danger posed by the grates was a cause of Evans death.[85] Plaintiffs contend that Fifth Circuit precedent does not require a plaintiff to show that a practice was the "exclusive" cause of a constitutional violation.[86]

Plaintiffs also argue that JP had actual and constructive notice of CHJ's failure to provide adequate healthcare at JPCC, and failed to mitigate that risk.[87] Plaintiffs contend that JP's liability is not based on CHJ's failure to care for Evans, but rather based on JP's failure to "uphold its responsibility to contract for constitutionally sufficient medical care."[88] Plaintiffs contend that under Louisiana law, JP is responsible for providing "requisite" health care services, and that they failed to do so by contracting with CHJ.[89]

Plaintiffs argue that JP created a dangerous condition of confinement by contracting with CHJ.[90] Plaintiffs point to deposition testimony that out of a daily population of about 950–960 detainees, about 200–300 detainees who were receiving mental health services.[91] Despite this case

---

[83] *Id.* at 10.

[84] *Id.* at 12.

[85] *Id.*

[86] *Id.* at 15.

[87] *Id.* at 16.

[88] *Id.* at 17.

[89] *Id.*

[90] *Id.*

[91] *Id.* (citing Rec. Doc. 127-19 at 21).

load, Plaintiffs argue that CHJ only employed one social worker and one part-time psychiatrist to attend to these detainees. [92] Plaintiffs contend that Jennings was at JPCC for about 40 hours each week, and did not have the time or resources to complete all of his required tasks.[93] Plaintiffs point to evidence that his "rounds through administrative segregation lasted 6-109  minutes for 30-40 people."[94] Plaintiffs also note, for example, that the day Evans was discharged from suicide watch, Jennings' saw 6 patients on suicide watch, all between 9:15 a.m. and 9:33 a.m.[95] As to Dr. Lo, Plaintiffs contend that he was only at JPCC for about an hour each week, as he was working full time at other jails.[96] Plaintiffs contend that during each visit he saw about 15 to 20 patients.[97]

Plaintiffs contend that staffing JPCC with only one social worker and a part time psychiatrist "created a dangerous condition of confinement," and that JP had actual or constructive notice of this dangerous condition.[98] Plaintiffs highlight an incident with a patient in 2016, as well as Joshua Belcher's suicide in 2017 to argue that JP "should have long been aware that its chosen medical contractor is providing constitutionally inadequate care."[99] Plaintiffs further contend that JP has no legitimate reason for failing to mitigate the risks of its failure to contract for requisite

---

[92] *Id.*

[93] *Id.* at 17–18.

[94] *Id.* at 18.

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id*. at 19.

[99] *Id.* at 21.

services.[100] Plaintiffs highlight a provision of the contract that would have allowed them to terminate the contract if CHJ was not performing adequately.[101] Therefore, Plaintiffs contend that JP is liable for creating a dangerous condition by contracting with CHJ.[102]

## C.   *Jefferson Parish's Arguments in Further Support of the Motion*

In reply, Jefferson Parish argues that it did not have actual or constructive knowledge of the risks of the window grates at the time of Evans' suicide.[103] JP contends that the evidence shows that Evans' suicide was the third in a span of less than two months that used the window grates, and it was not until after Evans suicide that JP was involved.[104] JP highlights Ronald Lampard's deposition testimony that it was not until after Evans' suicide that JPSO conducted an assessment and decided they wanted to do something about the window grates.[105] JP argues that Plaintiffs' evidence that JP had the requisite knowledge is "vague and conclusory and does not contain any details regarding what, if anything, Jefferson Parish actually knew about the windows or about the suicides before the death of Jatory Evans."[106]

---

[100] *Id.* at 22.

[101] *Id.*

[102] *Id.* at 23

[103] Rec. Doc. 158 at 1.

[104] *Id.* at 4.

[105] *Id.*

[106] *Id.* at 6–7.

14

JP further argues that there is no evidence that JP had actual or constructive notice that its contract with CHJ posed a risk of harm for JPCC detainees.[107] JP contends that although it contracts with a healthcare provider, it does not oversee CHJ's policies, practices, or employees.[108]

As to Plaintiffs' assertion that JP's motion did not address Plaintiffs' claims under state law or the ADA, JP argues that it addressed both.[109] JP further contends that under the ADA and RA, a plaintiff cannot recover damages unless he or she can prove intentional discrimination.[110] JP argues, however, that Plaintiffs here cannot prove that JP intentionally discriminated against Evans.[111] Lastly, as to Plaintiffs state law negligence claim, JP argues that Plaintiffs "failed to establish that [JP]'s inaction rises to the level of gross negligence or led to Mr. Evans' suicide."[112] Therefore, JP contends that it is entitled to summary judgment.

### III. Legal Standard

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[113] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[114] All reasonable inferences are drawn in favor of the nonmoving

---

[107] *Id.* at 7.

[108] *Id.* at 8.

[109] *Id.* at 9.

[110] *Id.* at 10.

[111] *Id.*

[112] *Id.* at 11.

[113] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[114] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing

party.[115] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[116] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[117] The nonmoving party may not rest upon the pleadings.[118] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[119]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[120] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[121] If the moving party satisfies its initial burden, the burden shifts

---

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[115] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 150).

[116] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[117] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cites Serv. Co.,* 391 U.S. 253, 289 (1968)).

[118] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[119] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[120] *Celotex*, 477 U.S. at 323.

[121] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

16

to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[122] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[123]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[124] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[125]

### IV. Law & Analysis

### A.   *Municipal Liability Under Section 1983*

Title 42 U.S.C. Section 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."[126] "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer

---

[122] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[123] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[124] *Little*, 37 F.3d at 1075 (internal citations and quotation marks omitted).

[125] *Morris*, 144 F.3d at 380.

[126] *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).

is clothed with the authority of state law.'"[127] Thus, to establish a claim under § 1983, a plaintiff must establish (1) a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation as committed by a person acting under color of state law.[128]

To assert a § 1983 claim against a municipality rather than an individual, a plaintiff must establish both (1) "that a constitutional violation occurred" and (2) "that a municipal policy was the moving force behind the violation."[129] Under the latter, a plaintiff must show three things: (1) an "official policy or custom 'was a cause in fact of the deprivation of rights inflicted,'[130] (2) the policy "served as a moving force" behind the constitutional violation, [131] and (3) the policy was decided on by a policymaker with "either actual or constructive knowledge of the alleged policy."[132] To satisfy the first requirement, the Supreme Court, in *Monell v. Department of Social Services of New York*, set out the possible methods of showing a policy or custom: "(1) [an] express policy of violating the Constitution, (2) a widespread practice or custom—even if that custom has not received formal approval by an official decision-making body—or (3) a decision by an individual with express policy-making authority."[133]

---

[127] *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

[128] *Randolph v. Cervantes*, 130 F.3d 727, 730 (5th Cir. 1997).

[129] *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 791 (5th Cir.), *cert. denied,* 141 S. Ct. 901, 208 L. Ed. 2d 455 (2020).

[130] *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

[131] *Id.* (internal citations and quotation marks omitted).

[132] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[133] *Cardenas v. Lee Cnty., Tex.*, 569 F. App'x 252, 255 (5th Cir. 2014) (citing *Monell,* 436 U.S. at 690–91).

Plaintiff also cites to the Fifth Circuit's decision in *O'Quinn v. Manuel*, which stated that "municipalities . . . may face liability under section 1983 where they breach duties imposed by state or local law."[134] "The critical point . . . is that such liability may result if municipal officials have actual or constructive knowledge of constitutional violations and fail to carry out their duty to correct them."[135] JP does not respond to this argument and thus offers this Court no reason not to apply this theory of municipal liability.[136]

Plaintiffs argue that JP is liable for (1) failing to remedy the window grates that Evans and others used to hang themselves and (2) failing to contract for constitutionally adequate healthcare.[137] Because JP is responsible for the "physical maintenance" of the jail as well as for contracting for health care services, Plaintiffs contend that JP can be held liable for breaching its duties under Louisiana law. The Court will discuss each in turn.

### 1. Failure to Contract for Constitutionally Adequate Healthcare

Plaintiffs contend that JP is liable under § 1983 because it breached its duty under

---

[134] *O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985).

[135] *Id.* (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)).

[136] Nor has the Court's own research uncovered any cases in which *O'Quinn* was overruled. In *Thompkins v. Belt*, the Fifth Circuit noted that the Supreme Court's decision in *Daniels v. Williams* may "call into question the proposition that a breach of duties imposed by state law can form the basis of an action under section 1983." 828 F.2d 298, 304 (5th Cir. 1987) (citing *Daniels v. Williams*, 474 U.S. 327 (1986)). In *Daniels*, the Supreme Court held that a plaintiff cannot bring a Section 1983 claim based on mere negligence by the state officials. 474 U.S. at 347. Here, Plaintiffs are not arguing that JP is liable under Section 1983 for mere negligence, but rather that JP failed to perform obligations imposed by state law, which caused Plaintiffs' constitutional injury. Moreover, the Court has found some support in subsequent Fifth Circuit caselaw that the breach of a duty imposed by state law can give rise to a Section 1983 claim when the breach causes the plaintiff's constitutional injury. *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1408–09 (5th Cir. 1995); *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998); *Jackson v. Nocona Gen. Hosp.*, 132 F. App'x 540, 541–42 (5th Cir. 2005).

[137] Rec. Doc. 127 at 6.

Louisiana law to contract for adequate health care.[138] The parties' briefing principally focuses on whether JP had actual or constructive notice of the quality of CHJ healthcare services at JPCC. However, the threshold issue is the nature of JP's duty imposed by Louisiana law.

Louisiana law provides that the parish "shall be responsible for the physical maintenance of all parish jails and prisons."[139] In addition, the parish "shall appoint annually a physician who shall attend the prisoners who are confined in parish jails whenever they are sick."[140] However, "[i]n lieu of appointing a physician, the governing authority of any parish may enter into a contract with a health care provider, licensed or regulated by the laws of this state, to provide requisite health care services, as required in this Section."[141] Furthermore, under Louisiana law:

> The *sole responsibility* of the governing authority of each parish which is mandated by the provisions of this Section with respect to providing health care services for prisoners shall be . . . its contractual obligations with a health care provider selected in accordance with this Section. The parish and its governing authority shall not be liable for any action arising as a result of the actions or inactions of the physician or health care provider . . . unless the governing authority exercises gross negligence or willful misconduct in the performance of its duties and obligations imposed by this Section, and such gross negligence or willful misconduct was a substantial factor in causing the injury.[142]

Plaintiffs claim that JP failed to "ensure that the healthcare they were paying for" was adequate, and "fail[ed] to evaluate whether its chosen medical provider was providing 'requisite'" care.[143] As the Court has already addressed in ruling on CHJ Defendants' motions for summary

---

[138] *Id.* at 16.

[139] La. Rev. Stat. § 15:702.

[140] La. Rev. Stat. § 15:703(A).

[141] La. Rev. Stat. § 15:703(B).

[142] La. Rev. Stat. § 15:703(D).

[143] Rec. Doc. 127 at 17, 22.

judgment, there is a dispute of fact as to the adequacy of CHJ's staffing at JPCC.[144] Furthermore, Plaintiffs point to evidence suggesting that JP knew of issues with the care provided by CHJ. Specifically, Plaintiffs point to evidence showing JP was aware of prior incidents involving Richard Fischer, Joshua Belcher, and Jerome Bell. Plaintiffs highlight evidence that under the terms of CHJ's contract with JP, CHJ was required to inform the parish in the event that CHJ was sued arising out of its medical services.[145] Furthermore, Joseph Denny testified about a meeting where they "were discussing how coincidental everything was. The manner in which it was done was the same."[146] Denny testified that in addition to Captain Olsen, Captain Bordelon, and Sue Ellen Monfra, he is "sure Ryan [Babcock] was there as well."[147] He further testified that Ryan Babcock was JP's Director of General Services.[148] In addition, Plaintiffs provide evidence of a provision in CHJ's contract with JP that would have allowed JP to terminate the contract if CHJ was not performing adequately.[149]

Given that there is evidence that JP was aware of issues with CHJ's care prior to Evans' death, and there is no evidence that JP sought to cancel the contract or ask CHJ to make changes, there are facts in dispute precluding summary judgment on the issue of whether JP was grossly negligent in its contracting with CHJ. Plaintiffs have presented evidence suggesting that JP had actual or constructive knowledge of constitutional violations and failed to carry out its duty, which

---

[144] Rec. Doc. 179.

[145] Rec. Doc. 127-17 at 4.

[146] Rec. Doc. 127-2 at 105–106.

[147] *Id.*

[148] *Id.* at 31.

[149] Rec. Doc. 127-17 at 6–7.

was imposed by state law, to correct them. Therefore, a reasonable jury could find that JP's failure to intervene or cancel the contract was the moving force behind Evans' suicide.[150] Accordingly, JP is not entitled to summary judgment on this claim.

### 2. JP's Failure to Mitigate the Risk of the Window Grates

As to Plaintiffs' claims that JP is responsible for the failure to mitigate the risk posed by the window grates, JP argues only that it is entitled to summary judgment because it did not have actual or constructive notice of the risk from the window grates until after Evans' suicide.[151] JP points to deposition testimony of Ronald Lampard, an employee of JP, who explained that *after* Evans' suicide, "the Sheriff's Office conducted an assessment and decided they wanted some work done at the jail to try to assist in preventing this from happening in the future. And that's when [JP was] brought into it, because as the entity responsible for doing repairs there [JPSO] would have contacted [JP] and said we need your assistance."[152]

Plaintiffs point to deposition testimony of Joseph Denny, an employee of the Jefferson Parish Criminal Justice Agency, who stated that CHJ would call him when there was a death at JPCC and that CHJ "would tell [him] if it was a suicide or not."[153] Plaintiffs also point to deposition testimony of Skye Noble, the "Health Services Administrator at JPCC, who testified that she would

---

[150] Both parties' briefing refers to deliberate indifference. However, the Fifth Circuit has "ma[de] clear that a plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor." *Duvall v. Dallas County*, 631 F.3d 203, 207 (5th Cir. 2011). Plaintiffs do not appear to be proceeding under such a theory against JP.

[151] Rec. Doc. 158 at 3.

[152] Rec. Doc. 108-5 at 98.

[153] Rec. Doc. 127-2 at 75.

have informed Joseph Denny of the deaths of Belcher and Bell by phone.[154] Based on this evidence, Plaintiffs contend that it defies belief that "no one from [JP] was aware that Mr. Bell and Mr. Belcher had died by suicide on or around August 4, 2017 and August 17, 2017."[155] Furthermore, given Denny's testimony that he stayed in "constant communication" with Captain Bordelon, Plaintiffs assert that it defies belief that "there was absolutely no communication between them about the fact that Mr. Bell and Mr. Belcher used . . . the expanded metal window grates . . . to hang themselves."[156] Lastly, Plaintiffs point to Major Olsen's deposition testimony that Deputy Chief Monfra "instructed [him] to get with the Parish to see what we could do to replace the gratings on the windows."[157] Plaintiffs point to the following exchange from Monfra's deposition:

> Q: [I]t wasn't 40 days after Mr. Belcher's death that the reach-out to Jefferson Parish happened, right? That would be a very long time.
>
> A: Correct
>
> Q: So it was sometime – whether the reach-out happened when Sheriff Normand was sheriff or when Sheriff Lopinto was sheriff, either way, that reach-out – not the resolution but the reach-out – happened before Mr. Evans died.
>
> A: Yes, sir.[158]

In addition, as discussed above, Denny testified about a meeting with JP employee Ryan Babcock where they were discussing "how coincidental" it was that there were multiple suicides occurring

---

[154] Rec. Doc. 127-5 at 81.

[155] Rec. Doc. 127 at 9.

[156] Rec. Doc. 127 at 10.

[157] Rec. Doc. 127-7 at 236.

[158] Rec. Doc. 127-8 at 186.

the same way.[159]

Louisiana law provides that the parish "shall be responsible for the physical maintenance of all parish jails and prisons."[160] Consistent with this duty, Lampard testified that JP's role was to "react to requests as need[ed] for repairs that are brought to" JP by the JPSO.[161] Plaintiffs argue that both the Sheriff and JP have a duty to identify maintenance needs, and relies on the following testimony from Denny's deposition:

> Q: So in terms of identifying maintenance needs, is that something that's the responsibility of the parish, or is that something that's the responsibility of the Sheriff?
>
> A: Both.
>
> Q: How does that division end up breaking down?
>
> A: I would say that the parish's responsibility, like for the HVAC systems, but we have specific engineers in there that that's what they do. That's their professional service. We also have a property maintenance people that are in there which will be handling day-to-day small every day needs that the Sheriff had request.[162]

The evidence suggests that JP was aware that two individuals committed suicide in the same manner as Evans in the same type of holding cell. There is evidence that at some point thereafter the Sheriff requested that the window grates be replaced. Under Louisiana law, JP was responsible for the physical maintenance at the jail.[163] There is a disputed issue of fact regarding when the Sheriff informed JP that the window grates needed to be replaced. Plaintiffs present

---

[159] *Id.*

[160] La. Rev. Stat. § 15:702.

[161] Rec. Doc. 108-5 at 22.

[162] Rec. Doc. 127-2 at 21–22.

[163] La. Rev. Stat. § 15:702.

evidence upon which a reasonable jury could rely to find that JP breached its obligation to provide physical maintenance at the jail by failing to replace the window grates.

Plaintiffs have presented evidence suggesting that JP had actual or constructive knowledge of constitutional violations and failed to carry out its duty, which was imposed by state law, to correct them. Therefore, a reasonable jury could find that JP's inaction was the moving force behind Evans' suicide. Accordingly, JP is not entitled to summary judgment on this claim.[164]

**B.      *Americans with Disabilities Act Claim***

The Second Amended Complaint asserted a claim against Jefferson Parish for the violation of the Americans with Disabilities Act ("ADA").[165] The instant motion sought that "Plaintiffs' Complaint against the Parish be dismissed in its entirety."[166] Nevertheless, the motion did not specifically discuss Plaintiffs' claim under the ADA. Plaintiffs opposed summary judgment on the ADA claim because JP did not discuss it in its motion for summary judgment.[167] Plaintiffs also opposed JP's motion for leave to file a reply[168] to address the ADA claim.[169] Plaintiffs further requested that, if the Court were to consider the ADA arguments raised in the reply, the Court also grant Plaintiffs an opportunity to respond. On June 6, 2022, the Court did so. The Court granted JP's motion for leave to file a reply and ordered that Plaintiffs file any response by 5:00 PM on

---

[164] Both parties' briefing refers to deliberate indifference. However, the Fifth Circuit has "ma[de] clear that a plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor." *Duvall*, 631 F.3d at 207. Plaintiffs do not appear to be proceeding under such a theory against JP.

[165] Rec. Doc. 38 at 30.

[166] Rec. Doc. 108-3 at 21.

[167] Rec. Doc. 127 at 23-24.

[168] Rec. Doc. 138.

[169] Rec. Doc. 139.

June 10, 2022. Plaintiffs did not file any such response, nor have they sought leave to file a response after the June 10, 2022 deadline. In failing to do so, Plaintiffs appear to concede that the claim should be dismissed.

In any event, it appears that Plaintiffs' ADA claim would also fail on the merits. To establish a claim under the ADA, a plaintiff must show: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.[170] The Fifth Circuit has recognized that the ADA also "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals."[171] "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations."[172] The second prong of this test is "ordinarily satisf[ied] . . . by showing that [an individual] identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms."[173]

Even assuming that Evans' risk of suicide was a qualifying disability, there is no evidence that Evans or his family requested an accommodation. "The burden falls on the plaintiff to identify the disability, the limitation, and to request an accommodation in 'direct and specific' terms."[174]

---

[170] *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

[171] *Smith v. Harris Cnty.*, 956 F.3d 311, 318 (5th Cir. 2020).

[172] *Id.* (quoting *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015)).

[173] *Id.*

[174] *Valentine v. Collier*, 993 F.3d 270, 290 (5th Cir. 2021).

Because there is no evidence that Evans or his family requested an accommodation, JP "cannot be held liable for failing to provide one."[175]

### C.     State Law Claims

The Second Amended Complaint also asserted a claim for "negligence and/or intentional conduct resulting in injury" against all Defendants, including JP.[176] As discussed above, the instant motion sought that "Plaintiffs' Complaint against the Parish be dismissed in its entirety."[177] Nevertheless, JP's only reference to Plaintiffs' state law claims is as follows:

> Further, even accepting Plaintiffs' arguments under state law as true, Plaintiffs failed to establish that the Parish's inaction rises to the level of gross negligence or led to Mr. Evans's suicide.[178]

For the reasons discussed above, there are disputed issues of fact regarding whether JP was grossly negligent in contracting with CHJ and whether JP breached its duty to provide maintenance at the jail. Accordingly, JP is not entitled to summary judgment on the state law claims.

### V. Conclusion

Based on the foregoing, there are facts in dispute precluding summary judgment on the issues of whether JP was grossly negligent in contracting with CHJ and whether it breached its duty to provide maintenance at the jail. Plaintiffs have presented evidence suggesting that JP had actual or constructive knowledge of constitutional violations and failed to carry out its duties, which were imposed by state law, to correct them. Therefore, a reasonable jury could find that JP's

---

[175] *Edwards v. Wal-Mart Stores, Inc.*, 247 F.3d 241, 2001 WL 43546 at *2 (5th Cir. 2001).

[176] Rec. Doc. 38 at 34.

[177] Rec. Doc. 108-3 at 21.

[178] *Id.*

inaction was the moving force behind Evans' suicide. However, Plaintiff failed to respond to the Court's invitation to brief the ADA claim, and thus has failed to put any facts in dispute as to that claim. In any event, there is no evidence to suggest that Evans or his family requested an accommodation.

Accordingly,

**IT IS HEREBY ORDERED** that Jefferson Parish's Motion for Summary is **GRANTED IN PART** and **DENIED IN PART.** The motion is **GRANTED** to the extent it seeks dismissal of the ADA claim. The motion is **DENIED** in all other respects.

**NEW ORLEANS, LOUISIANA,** this 27th day of June, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

28